■ In the Matter of NATHANIEL T. and Others, Children Alleged to be Permanently Neglected.—Order reversed, on the law and facts, without costs, petition dismissed and matter remitted to Monroe County Family Court for further proceedings, in accordance with the following memorandum: Upon our review of the record, we do not find that petitioner established by clear and convincing evidence that respondents permanently neglected their children (see, Social Services Law § 384-b). While Family Court's findings must be accorded great weight (see, Matter of Irene O., 38 NY2d 776), we do not agree that respondents failed to plan for the future of their children or themselves (see, Matter of Leon RR, 48 NY2d 117, 125; Matter of Orlando F., 40 NY2d 103, 110). Here, the record reveals that respondents maintained sufficient contact with their children, visited them frequently, wanted to reestablish a family relationship and attended the many services to which the agency referred them. Respondent father maintained steady employment and respondents had stable housing. Unquestionably, the respondents on numerous occasions demonstrated an inability to cope adequately with their difficult and at times behaviorally disturbed children (indeed, one of the social workers admittedly could not manage the two boys at once) and the record shows that they did not attain the level of skill at child care or the degree of improvement which the social workers apparently expected. Family Court stated: "The [respondents] always came to visits, apparently loved their children, and frequently attended the services referred to, but could not or would not put into practice any of the theories they heard. They couldn't internalize the ideas." The court's determination that respondents failed to plan for the return of their children appears to be based on their failure to change their attitude and transform themselves into skilled, competent parents. In our view, this is insufficient to justify termination of parental rights. Matter of Joyce T. (65 NY2d 39), relied on by the dissenters, is not controlling here. There, the court (p 49) held that a dispositional hearing was not necessary where parental rights with respect to Joyce T. were permanently terminated on the ground that the parents, who were mentally retarded, "have been convincingly shown to be wholly incapable of providing proper and adequate care for

the child for the foreseeable future". The record in the case at bar does not support a similar finding and indeed there is evidence that respondents were improving. Accordingly, we remit the matter to Family Court for decision on the outstanding extension of placement petition and an appropriate custody determination. In view of our holding, we find it unnecessary to discuss the procedural issues raised on appeal.

All concur, except Doerr and Denman, JJ., who dissent and vote to affirm, in the following memorandum.

Doerr and Denman, JJ. (dissenting). We respectfully dissent and would affirm the order of Family Court adjudging the children herein to be permanently neglected and transferring their guardianship and custody to petitioner, the Department of Social Services of Monroe County, empowering it to consent to the children's adoption.

It is necessary to give a brief outline of the troubled history of this litigation. Respondents' five children are Nathaniel (date of birth Dec. 4, 1973), Andrew (date of birth Dec. 10, 1975), Angelique (date of birth Feb. 11, 1977), Heather (date of birth June 15, 1978) and Melissa (date of birth Nov. 4, 1979). Kenny T. is the natural father of all but Nathaniel. On August 3, 1978 the four older children (Melissa was not yet born) were placed in foster care at the behest of Visiting Nurse Services, the Society for the Prevention of Cruelty to Children, and Monroe County Health Department, based on numerous reports that the children had been subjected to excessive corporal punishment; that the children were observed smeared with feces, smelling of urine and living in unsanitary conditions; and that the children were frequently locked in their rooms. Three weeks later, Angelique and Heather were returned pursuant to a consent order which imposed numerous conditions on respondents. To assist in improving respondents' care of the children, they were provided with a variety of services including those of a public health nurse, a teaching homemaker, day care and family counseling. Because the situation in respondents' home did not improve, in March 1979 the children were again adjudicated neglected and placed in foster care. Under the terms of the consent order, respondents agreed to subject themselves and the children to psychiatric evaluation, to attend a parenting group, to cooperate with plans recommended by the Hillside Children's Center and De Paul Clinic and to refrain from use of excessive corporal punishment. Another consent order was entered in September 1980, pursuant to which respondents consented to a finding of neglect of all five children.

Under the terms of that order respondents agreed to participate in parenting training, marriage counseling, and to avoid excessive corporal punishment. All of the children except Nathaniel were returned but were given day care by petitioner.

Two months later, another neglect petition was filed alleging that respondents had violated the terms of the consent orders by using excessive corporal punishment on Andrew, by leaving the children with a 12-year-old baby-sitter who left the children unattended, and by neglecting to send the children to day care. Following an evidentiary hearing, Family Court found, based on medical testimony and photographs, that Andrew had been physically abused by respondents. Family Court also found that Kenny T. was prone to beating his wife and Andrew, that both respondents had poor judgment regarding the care of the children, that conditions in the home were unsanitary and that the other children were in danger of harm. Following a dispositional hearing, the children were placed in foster care. Family Court noted that each of the children had developed serious emotional problems. For example, Nathaniel, who was then 8 1/2, was not toilet trained, was extremely aggressive, fearful of his father and related stories told him by his mother that he is half devil and half horse. Angelique, then age 3 1/2, expressed fear of being locked in her room, and claimed that her father put feces in her mouth as punishment. All five children exhibited aggressive behavior, suffered attention deficit syndrome and expressed fear of respondents. Family Court directed that the family be evaluated at a mental health center, that visitation be supervised, that visitation with the two boys cease until further order of the court, and that respondents continue in treatment at the Genesee Mental Health Center. That order was modified by this court to reinstate visitation with Nathaniel and Andrew (*Matter of Nathaniel T.*, 97 AD2d 973).

The petitions in the present proceeding were brought in May and June 1983 to terminate respondents' parental rights pursuant to Social Services Law § 384-b (4) (d); (7) (c) on the basis that respondents have failed to plan for the children's future. Six witnesses, including a social worker with the Catholic Family Center, a foster care worker, a teaching homemaker, and several child protection workers, testified to the efforts made by petitioner initially to keep the children in the home with support services, and later to reunite the children with respondents. It is abundantly clear that petitioner fulfilled its obligation to exercise diligent efforts to

reunite the family (*see*, Social Services Law § 384-b [7] [e]) and afforded them a wide range of services. Despite petitioner's efforts, witnesses testified that respondents have been highly resistant to changing their conduct and attitudes, that they have consistently blamed the agencies for their problems, and that they have been unwilling or unable to recognize the problems which led to removal of the children from their home. Although they attended counseling sessions, they were unable to internalize the subject matter or to relate it to their behavior toward the children. They continually criticized the programs to which they were referred and did not seem to understand that the programs were designed to prepare them for return of the children.

A pediatrician and a clinical psychologist testified that all of the children now suffer in various degrees from attention deficit syndrome, characterized by a short attention span and impulsive behavior; from hyperactivity, for which they are medicated; and from encopresis, an inappropriate and frequent discharge of feces. All are emotionally disturbed in some degree. The mental health professionals and foster parents testified that the children's abnormal behavior is aggravated by visitation with respondents and that the children continue to express fear of being beaten and of being locked in their rooms. The testimony indicated that respondents did not seem to recognize the children's problems and individual needs, and that they are totally unable to provide the firmness and stability which the children badly need. Caseworkers testified that they were constantly rebuffed in their efforts to discuss methods which respondents could use in handling their children's disruptive behavior. There was testimony that respondents had begun to make progress in a supervised visitation program with the three younger children so that by January 1983 they were able to visit with those three children at one time. However, as Family Court noted, that was nearly five years after the children had initially been removed from the home. It is also worth comment that both respondents have children from prior relationships who are in permanent foster care.

Confronted with a situation in which years of counseling and assistance from a wide range of services had failed to equip respondents to care for their children properly, Family Court found that the children were permanently neglected because of respondents' failure to plan for the future of the children within the meaning of Social Services Law § 384-b (7). Despite their expression of love for the children and a desire

for their return, they had gained no insight into their own behavior which had been so physically and emotionally damaging to the children and had required their removal. The majority is of the view that respondents' failure to transform themselves into competent parents is an insufficient basis for a finding of permanent neglect. That view, in our opinion, gives rise to an irresolvable dilemma: parental rights cannot be terminated yet the children cannot be returned because the parents have shown no inclination to modify their behavior. The result, inevitably, is long-term foster care, a condition which is emotionally damaging to the children because of its uncertainty and instability.

In *Matter of Joyce T.* (65 NY2d 39), the court affirmed an order terminating parental rights based on a finding of respondents' mental retardation and inability to care for their daughter, who had been placed in long-term foster care. The court noted that respondents, although loving parents, were incapable of parenting because they lacked independent judgment and were unable to meet their child's nutritional, physical and educational needs for the foreseeable future. Although the court's termination of parental rights in the present case was based on respondents' failure to plan for the future, we believe *Matter of Joyce T.* (*supra*) is analogous and supports an affirmance of the orders of Family Court. There the court stated (p 48) that "foster care is viewed as a temporary way station to adoption or return to the natural parents, not the purposeful objective for a permanent way of life." Recognizing that long-term foster care is not in a child's best interest (*see,* statement of legislative intent, Social Services Law § 384-b [1] [a] [iv]; [1] [b]), the Legislature has provided for termination of parental rights where parents have failed to take such steps as may be necessary to provide an adequate, stable home and parental care for their children within a reasonable period of time (Social Services Law § 384-b [7] [a]). It is not enough that parents act in good faith or that they genuinely wish to have their children returned. The statute requires "at a minimum, that the parents take steps to correct the conditions that led to the removal of the child[ren] from their home" (*Matter of Leon RR,* 48 NY2d 117, 125). While the parents' plan must not be evaluated by unrealistically high standards, we believe the statute contemplates more than mere compliance with referral to counseling and parenting classes. There must be evidence that respondents have gained insight into the problems which led to the finding of neglect in the first instance and that they are progressing in their efforts toward changing

their behavior. The evidence here, to the contrary, was that respondents failed to perceive that their attitudes and behavior toward the children are wholly inappropriate and grossly damaging. We therefore agree with Family Court that respondents' efforts to plan for the future of their children have been seriously deficient and that the basis for termination of their parental rights has been established by clear and convincing evidence.

These children have been the subject of three prior adjudications of neglect based on physical neglect, emotional trauma and excessive corporal punishment. "When the natural parent fails to accept the parental role, even though the result of shortcomings for which he or she may not be fully responsible" termination is warranted (*Matter of Orlando F.*, 40 NY2d 103, 111). Consequently, we would affirm the decision of the Family Court, which was in the best position to assess respondents' attitudes and efforts to plan for the future of their children (*Matter of Irene O.*, 38 NY2d 776, 778). (Appeal from order of Monroe County Family County, Wisner, J.—terminate parental rights.) Present—Hancock, Jr., J. P., Callahan, Doerr, Denman and Green, JJ.