OPINION OF THE COURT
George D. Marlow, J.
This opinion follows a lengthy and prolonged combined *642 hearing on petitions filed by both the Dutchess County Department of Social Services (hereinafter DSS) and Mr. G. and Mrs. G. (hereinafter respondents). The agency’s petitions seek to terminate the G.s’ parental rights to their five-year-old son, T.G. (born Oct. 21, 1982), based on permanent neglect (Social Services Law § 384-b [7]). Respondents seek T.G.’s return to them from the foster home where he has lived since the fall of 1984, or, in the alternative, to have their right to visit with him liberalized.
By way of background, T.G. first entered foster care in September 1984 when he and his parents arrived in Dutchess County from the State of Georgia. Following his temporary removal, this court held a lengthy fact-finding hearing on a DSS claim that respondents and others sexually abused T.G., along with his twin half siblings, in Georgia. There had been an earlier judicial finding to that effect in Georgia, following which respondents moved with T.G. to New York.
A derivative finding of neglect of T.G. (Family Ct Act § 1046 [a] [i]) was made after the article 10 hearing in a decision of this court dated May 21, 1985 (see, Matter of T.G., 128 Misc 2d 914). In the resulting October 22, 1985 consent dispositional order placing him in DSS custody for 18 months, respondents agreed, inter alia, to supervised visitation with T.G., and to undergo evaluation and treatment for incest for as long as judicially deemed necessary.
No appeals were taken from either the Georgia or the New York decisions and orders.
Respondents cooperated with the arrangements made for visiting their son, and both substantially adhered to the counseling schedule. Indeed, petitioner admits the foregoing compliance. Moreover, there is virtually no dispute that petitioner has made the diligent efforts to reunite the family mandated by Social Services Law § 384-b (7) (f).
Consequently, both sides agree that only one issue remains, namely, whether respondents’ adamant, long-standing, and repeated refusal to admit, in counseling, that they committed any incestuous acts can form the sole factual basis for a termination of their parental rights. The court’s resolution of this issue assumes, based on the unappealed findings of two separate courts, that respondents in fact sexually abused T.G.’s twin half siblings (born on Mar. 6, 1979 of Mrs. G.’s prior relationship).
Petitioner agency argues that the G.s’ parental rights to *643 T.G. should end because they have failed "to plan for the future of the child” pursuant to Social Services Law § 384-b (7) (a) and (c). The crux of petitioner’s position is that there can be no meaningful plan for an "adequate, stable home and parental care for the child” if respondents are not effectively treated for their incestuous behavior. DSS further argues that the proof clearly and convincingly shows that, without an admission by them that they committed sexual acts upon Mrs. G.’s twin children in Georgia after T.G. was born, there can be no meaningful treatment. It further contends that, without effective treatment, the G.s cannot, in the foreseeable future, be trusted to be unsupervised caretakers of T.G. Underlying its argument is petitioner’s assertion that, if Mr. and Mrs. G. never acknowledge their offensive acts, they can never, in counseling sessions, address the root of their behavior problem, and, therefore, no therapeutic progress can be made with them. It is further argued that without therapeutic progress in treatment, respondents cannot plan for T.G.’s future because the danger of abuse remains. With the remaining risk thus posed to this little boy, DSS contends that he is "a permanently neglected child” pursuant to Social Services Law § 384-b (7) (a).
To prove this thesis, petitioner offered testimony by Donna L. Zulch and Judith V. Becker. Dr. Becker is a clinical psychologist with an impressive amount of experience in evaluating and treating sex abuse victims and offenders. She also has done an exhaustive amount of research and writing on this and related subjects.[1] Ms. Zulch is a clinical social worker also with a considerable amount of training and practical experience in this area of expertise.
Respondents first contend that they are innocent of all sexual abuse charges, but, that aside, they also claim to have fully cooperated with the consent dispositional order, and have thereby attained a greater knowledge of, and sensitivity to child sexual abuse. They called six mental health professionals,[2] one pastoral counselor, three DSS workers, and four lay witnesses. Respondents also testified on their own behalf.
Respondent, Mr. G., and his witnesses testified, without *644 contradiction, from November 1985 until February 1987, with few absences, he attended weekly counseling with a group program for men who had become involved, either actively or passively, in child sexual abuse. Mr. G. often talked to the group about the pain of T.G.’s absence, his own denial of the acts of abuse, and his belief that DSS personnel were insensitive toward him and his family.
In addition to his uncontested testimony that he visited T.G. frequently, he claimed DSS often denied his request for more visits. He also described additional counseling, both individual and joint, that he and Mrs. G. had with Rev. Douglas L. Murray and later with Dr. David Sparks. The primary purpose of these sessions was to help respondents cope with the stress of their separation from T.G.
Mr. G. asserted his belief that all of this counseling has changed him, stating, "I’m not the same person I was.” He declared that he has "come to grips” with T.G. not living in his home, but he expects to see T.G.’s return someday. Finally, he continued his denial, and, later, upon being specifically recalled to the stand for this purpose, he unequivocally declared that he will never admit to any acts of sexual abuse whether he goes to counseling individually or in a group. His denial is so firm and unyielding that he and Mrs. G. joined and led a mutual support group, known as Victims of Child Abuse Laws (V.O.C.A.L.), which meets with its local membership of 12 people to discuss changes in the law, the power of the Department of Social Services, and other related systemic shortcomings as they see them.
Rev. Douglas L. Murray, senior pastor at The Full Gospel Center in LaGrangeville, New York, gave extensive pastoral counseling to this couple. He recounted their continued denials of wrongdoing, and their affectionate attitude toward T.G. during encounters at the church. Furthermore, he opined that T.G.’s return to respondents’ home would not place him at risk, notwithstanding his own conceded inability to determine whether respondents sexually abused T.G. or the twins. Rev. Murray’s conviction that T.G. would be safe with the G.s is based on his having shown them the correct way to establish a moral Christian home according to biblical principles as taught in his church, and his having schooled them in the proper practice of Christian morals. Because of these efforts, he is now confident that they have a matured commitment to the word of God and are therefore trustworthy parents.
*645 Respondent, Mrs. G., described all of the efforts she has made to cooperate with the outline of the consent dispositional order by attending various types of counseling, both formal and informal, with Jean Dingee, Nancy McCormick, Renee Hack, Rev. Douglas Murray, Dr. David Sparks, and Dr. Diane Succich. With a backdrop of continued denials of any sexual wrongdoing, her counseling emphasized her feelings of loss due to T.G.’s absence, the inappropriateness of sexual abuse toward children in general, the religious and moral issues connected to the subject of child sexual abuse, the correct way to discipline children, and the anger she displayed when first entering counseling. She testified that DSS representatives repeatedly attempted to persuade her to admit wrongdoing and that she was told that, without such an acknowledgement, T.G. should never be returned to her. She proclaimed her intense love for T.G. and her belief that he likewise loves her. Although she conceded drug use a decade ago, she denies using drugs at present.
Finally, she vehemently denies ever sexually abusing any of her children, and has specifically and forcefully declared that she never will admit to such acts.
She described herself as a Pentecostal Christian since she returned to New York from Georgia where she practiced the Lutheran faith. She has become very involved in the New York State Chapter of V.O.C.A.L. and its local efforts in this county. She traveled to V.O.C.A.L.’s Minnesota headquarters to be interviewed by the authors of a book, The Politics of Child Abuse, which contains a chapter describing her version of the events leading to T.G.’s removal from her home. The underlying assumption of her statements is that she and her husband have done nothing wrong. She also claims to have been interviewed by various members of the local and national media and has consistently denied any abuse.
Donna Zulch and Dr. Judith V. Becker supported the agency’s contention that the G.s’ parental rights be terminated, or, at the very least, that T.G. not be returned to their unsupervised care.
Ms. Zulch said: "Okay. The cornerstone of * * * any treatment plan regarding sexual abuse * * * is that that * * * one take accountability for one’s own behavior. The second, third, and fourth items * * * would include the consequence of responsibility, and perhaps restitution to the child-victim * * *. And, understanding the dynamics that led to the abuse *646 by the offender, and other family members, and finally establishing new behaviors towards impulse control to find other methods of dealing with one’s impulse rather than sexually abusing a child. And * * * based upon my clinical experience, as well as many of the writings by national experts across the board, acknowledgement of the behavior is first and foremost, in terms of successful treatment, directly correlated.”
Dr. Becker, an associate professor of clinical psychology in psychiatry at the Columbia College of Physicians and Surgeons, addressed the central issue in this case. She testified that acknowledging and accepting responsibility for the wrongdoing are prerequisites to successful treatment. She further said that treatment must include "(1) admitting you have done something wrong, (2) working to change your behavior, and (3) not placing yourself in the same situation where certain stimuli would bring up that response.” She further stated, "As a matter of fact there appears to be a trend among treatment agents in this field to not accept for treatment individuals who do not admit.” However, in her program, such people will be accepted for treatment with the expectation that once they finally admit the abuse "they can get on with working to change that behavior. If the denial is very entrenched and they don’t say, T did something wrong,’ they are not owning up to it and accept responsibility for their behavior.” She further testified, "but it is my belief at the end of treatment if a person is still denying; or has still not accepted responsibility, I feel that there is a risk.” She added that the risk is increased and compounded in this case because both parents committed the acts and both refuse to admit, so that society cannot rely on either parent to supervise the other and thereby protect the child from any remaining risk after treatment. She also stated that the overwhelming view of "professionals that work with offenders in this country” is that an admission is "critical” to successful treatment.
Her opinion is that parents undergoing effective treatment may be reunited with their children, but only after that treatment is successfully completed. This generally takes less than one year, but involves an admission early in the process. She testified that the G.s’ denials are so persistent that rehabilitation would be very unlikely. She commented that, in her experience treating offenders, she has never been successful if the patient continues to deny. Moreover, she contended that respondents’ religious affiliation and commitment in no *647 way lessen the weight of her opinion because, "in the years that I have been doing this work I probably have treated people from every religious denomination. We have seen priests, ministers, rabbis who have engaged in pedophilic behavior, so attendance at a church or being high up in a religious hierarchy doesn’t contraindicate that a person is a paraphiliac * * * in a number of cases we have seen a flight into religion. There have been some cases where they have enrolled in one religious group or another and they tell us they have repented; they have found the Lord and no longer have the problem they were accused of having. So we don’t see religiosity as solving the problem, nor does it contraindicate having this problem.” When asked about the significance for rehabilitation, of the G.s’ specific declaration that they never will admit the sexual abuse, and their long-standing denials in every context, Dr. Becker concluded that there is no reasonable likelihood that they will ever admit the abuse and therefore none that there will ever be productive treatment. Moreover, according to Dr. Becker, the fact that they complied with the order to attend therapy until now does not necessarily "mean that you have affected their sexual interest.” Finally, she agreed that "the longer the denial continues, the greater the risk [to T.G.] would be, even if there is an admission at some point”.
Henry Earl Adams testified in rebuttal. A clinical psychologist, he has held various significant teaching and research positions, and his primary professional and clinical activity involves "treating sexual deviants” and teaching others the necessary treatment skills. Most of his 300 patients have been pedophiles. He has also evaluated over 500 others, and has written extensively about "sexual deviant behavior.”
He examined respondent, Mr. G., employing various modes including a penile plethysmograph, also known as a penile transducer. He described this procedure as follows: "the individual is put in a chamber * * *. They are exposed to sexually explicit material both by phototapes, by slides, by audiotapes. Essentially, these materials cover sexual interaction with children, both males and females, at two age levels. We usually assess at eight to ten years old and four to five years of age * * *. We instruct the individual that when we leave the room he is to attach what is called a mercury and rubber strain gauge to the penis * * *. It is essentially a strain gauge * * *. It measures resistance essentially, and it is a little circular device that is placed on the penis. What it does is *648 measure engorgement or change of blood flow in the penis. That signal is sent into another room where we have the equipment amplify it * * *. The logic behind it is that when one orients to a sexually attractive object there is not only a subjective kind of change but there is also changes in blood flow, most of it controlled by the autonomic nervous system, which to some extent are involuntary.” Dr. Adams contended that, for testing pedophiles, this type of examination is generally accepted by professionals as valid, and it is between 85 and 90% accurate. However, he conceded that as many as 15% may be pedophiles, but yet show a negative test result.
On the basis of his entire examination, including the result of the plethysmograph showing that Mr. G. did not become sexually aroused by either male or female children, Dr. Adams concluded that T.G. would not be at risk living with the father.[3]
In rebuttal, Dr. Becker testified that the penile plethysmograph has not gained acceptance by the scientific community as a reliable predictor of future behavior, and that recent studies have borne out that lack of confidence. She also leveled some criticism at the procedures used to test Mr. G., concluding that the instant predictive test result is not reliable.
Thus presented, the evidence raises a question which is apparently more common than the dearth of published New York decisional authority suggests. That issue is whether the parental rights of a sexually abusive couple should be terminated if, during rehabilitative counseling, they persistently refuse to admit their abuse, and, thereafter, unequivocally and convincingly declare that they never will.
Respondents argue that an admission is unnecessary for treatment to be successful. They claim they have made great progress since the 1985 consent dispositional order, and that they have acquired much maturity and religious commitment as a result of their conceded compliance with its outline and the additional services they received on their own.
After reviewing the enormous amounts of material submit *649 ted herein, including previous court documentation and the extensive professional and lay testimony adduced at this trial, the three stipulated options have been thoroughly examined and deeply considered by this court, i.e., (1) returning T.G. to respondents either before or after a gradual liberalization of visitation; (2) ordering an extension of care and further treatment with continued supervised visitation, and again evaluating the matter after an additional year; or (3) adjudicating T.G. to be a "permanently neglected child” and terminating respondents’ parental rights. The parties have agreed, pursuant to Family Court Act § 625 (a), that, should the court decide on the last option, no dispositional hearing would be necessary because no factual issues would remain.
To begin with, the proof is abundant that petitioner has complied with the legislative mandate to apply diligent efforts to reunite T.G. with his parents. In doing so they have carried out New York’s strong public policy which holds that "before the State may terminate parents’ rights it must first attempt to strengthen familial ties (see Matter of Leon RR, 48 NY2d 117, 126).” (Matter of Sheila G., 61 NY2d 368, 383.)
In addition to implementing the directions to allow regular supervised visitation, petitioner has also satisfactorily proven that it set up a plan for each respondent to obtain appropriate counseling as was intended by this court. As their record of attending counseling sessions was by and large sufficient, it is the quality of each parent’s response to this tendered treatment that kindles the flame of this trial’s burning issue.
As clear as the law is that diligent efforts must be made by DSS (Social Services Law § 384-b [7] [f]), so too it is that parents who seek to have their children returned must respond to those efforts by taking genuine steps to realistically plan for their children’s safe future. (Matter of Nathaniel T., 67 NY2d 838, 841-842; Matter of Jamie M., 63 NY2d 388, 393; Matter of Star Leslie W., 63 NY2d 136; Social Services Law § 384-b [7] [a], [c].) Such steps of necessity include overcoming the specific deficit that created their family’s upheaval and caused their offspring’s initial displacement. (Matter of Leon RR, 48 NY2d 117, 125; Matter of Ray A.M., 37 NY2d 619, 622-623; Matter of Regina M. C., 139 AD2d 929; Matter of Jessica MM., 122 AD2d 462; Matter of Ronald YY., 101 AD2d 895.)
Thus, in order to prevail herein, petitioner had the burden of establishing by clear and convincing evidence that these parents failed to plan for T.G.’s future by failing to take *650 genuine steps to overcome their behavioral problem. (Santosky v Kramer, 455 US 745; Matter of Michael B., 58 NY2d 71; Matter of Alexander, 127 AD2d 517.)
That DSS sustained its burden emerges as the only logical conclusion from all the evidence. Although petitioner’s witnesses alone convincingly established the critical inadequacy of the G.s’ response to treatment and the weakness of their contentions herein, many of respondents’ own witnesses added strength to the agency’s position.
Petitioner’s two professional witnesses have satisfied this court that the G.s’ continuing steadfast denials preclude the kind of treatment they manifestly need. And, while the experience and research of these two experts overwhelmingly show that child sex abusers must deal with their own conduct on a very personal — rather than abstract — level, ordinary logic and plain common sense suggest the very same thing. (See, Matter of Lisa L., 117 AD2d 931.)
This court is not the first to grapple with this problem, and tragically it will probably not be the last. A trial court in In re Kristin B. (187 Cal App 3d 596, 232 Cal Rptr 36) refused to ever turn abused children back to their parents for the same reasons given by petitioner herein. And in various contexts, but based upon a similar rationale, the refusal to admit abuse has been a persuasive factor against the return of children, in favor of termination, against granting custody to abusers, and against according them leniency (State v Tunell, 51 Wash App 274, 753 P2d 543 [Wash App 1988]; Dymenstein v State, 720 P2d 42 [Alaska App 1986]; Matter of V.H., 412 NW2d 389 [Minn App 1987]; People v Draper, 150 Mich App 481, 389 NW2d 89 [1986]; In Interest of K.L.C., 372 NW2d 223 [Iowa 1985]; In re Interest of V.B., 220 Neb 369, 370 NW2d 119 [1985]; In Interest of Two Children, 477 So 2d 883, 888 [La Ct App, 4th Cir 1985]; In re Juvenile Appeal [84-AB], 192 Conn 254, 471 A2d 1380 [1984]; Matter of Welfare B.C., 356 NW2d 328, 331 [Minn App 1984]; In Interest of T.D.H., 344 NW2d 268, 270 [Iowa 1984]; In re Interest of Brungardt, 211 Neb 519, 319 NW2d 109, 115 [1982]; In Interest of Long v Long, 255 NW2d 140, 145 [Iowa 1977]; In Interest of R.W.B., 241 NW2d 546, 557 [ND 1976]; cf, Matter of Adoption of Embick, 351 Pa Super 491, 506 A2d 455, 468-471 [1986]).
In State v Lawrence (112 Idaho 149, 157, 730 P2d 1069, 1077 [1986] ) the court said: "Many courts have held that an acknowledgement of guilt is a critical first step toward rehabili *651 tation. United States v. Hull, 792 F.2d 941 (9th Cir. 1986); United States v. Floyd, 496 F.2d 982 (2d Cir.), cert, denied, 419 U.S. 1069, 955 Ct. 654, 42 L.Ed 2d 664 (1974); Gollaher v. United States, 419 F.2d 520 (9th Cir.), cert, denied, 396 U.S. 960, 90 S. Ct. 434, 24 L.Ed. 2d 424 (1969).”
Respondents dispute the notion that an admission of guilt is fundamentally necessary, and they argue that, in addition to their belief in their innocence, they and T.G. intensely love and care for each other and he can therefore be safely restored to their home. However, that reasoning was rejected by the Appellate Divisions’ two dissenting Judges in Matter of Nathaniel T. (112 AD2d 692, 695-697) (subsequently the unanimous view of the Court of Appeals in Matter of Nathaniel T., 67 NY2d 838, 841-842, supra). They wrote that "expression of love” and a desire for children’s return are not enough if parents acquire "no insight into their own behavior” which caused the removal. (Supra, at 695-696.) Parents must unveil more than acts of "good faith”, and do more than merely comply "with referral to counseling and parenting classes.” (Supra, at 696.) Indeed, they must gain an understanding of their problems and make progress "in their efforts toward changing their behavior.” (Supra, at 696-697.)
The foregoing reasoning is, in part, the clear and convincing theme of Dr. Becker’s testimony, flanked by the opinions of Ms. Zulch and, as well, of respondents’ mental health expert witnesses. Dr. Becker’s opinions were not only clearly and concisely articulated, but they are anchored by the strength and breadth of her experience and her credentials.
Moreover, the results of the plethysmograph as a predictor of human behavior cannot be considered. The proof establishes that it is not only a device with, at best, questionable professional recognition, but one whose conceded margin of error is too great to reliably forecast T.G.’s safety.
A word needs to be said about the G.s’ apparent attempt to prove that their religious belief and involvement have a telling effect on their position in this case. Although some might have been tempted to reject, out of hand, the significance of their religious fervor, this court sees it as having had a most positive potential. Religion can and does serve as a means to pray, to enrich and strengthen family life, to inspire commitment, to still anger, to foster understanding, to encourage compassion and good deeds, and to soothe the piercing edge of pain following a loss. To many people these are *652 everyday human miracles which naturally flow from a sincere belief in a Supreme Being, and a tender relationship between themselves and a caring pastor, as Rev. Douglas L. Murray was proven to be.
However, petitioner has also proven that respondents’ stance herein defies basic clinical principles. To be sure, an argument could have been persuasively made that the G.s’ piety could have played a major role in their rehabilitation, but only if they first admitted, addressed, and confronted the behavioral problem they both have.
Moreover, the court is most reluctant to allow its decision to be influenced by testimony that the G.s’ newfound discoveries of religious morality and "the word of God” are themselves guarantees of T.G.’s safety. For, if the nature of one’s religious beliefs can override proven and antithetical legal and scientific principles, courts would face the impossible task of choosing which religion’s beliefs are "acceptable” and which are "unacceptable” for the purpose of assuring the safety of abused children. Moreover, even assuming that respondents’ religious beliefs are genuine, it does not change the essential complexion of this case. And, while it may tempt a court’s inclination to resolve a matter by placing complete trust in a party’s religious faith and enthusiasm, the facts of this case, together with the testimony and experience of six experts, outweigh such considerations. Indeed, such inclinations do not relieve the court of the obligation to consider a demonstrable, unresolved, and existing risk to this child.
The threat posed by the underlying factual scenario of extreme child sex abuse is most profound, and the efforts expended by all parties at various stages in the history of this case are legion. And, if we further assume — as the court has and still does — the high emotional intensity of the G.s’ natural feelings of love for their son and he for them, there is no easy road to resolve this conflict.
But, by any reasonable standard, more than enough time has passed to give this couple a continuing opportunity to reunite themselves with their son. This court has, sometimes reluctantly, exercised its wide discretion to give all sides every chance to repair this family even during the course of this trial, to encourage the G.s to admit at every turn, and to afford each side every opportunity to produce prominent and busy expert witnesses so that the central issue could be studied under the best possible circumstances. The process *653 was long and arduous, but the significance of the issue unquestionably justified the time and effort. However, the G.s’ response is clear, dramatic, and unyielding. Mr. G. said that even if an admission by him "would resolve all of the issues involved in this case” he never will. And, likewise, Mrs. G. proclaimed with equal conviction, that no type or amount of therapy or counseling would ever cause her to admit to any sexual abuse.
Entangled amid these postures stands a little boy approaching his sixth birthday. He needs a safe and permanent home. This need overrides all else, and it is fortunate for him that throughout this entire process he has basically lived in only one foster home. But now, after the hearing is concluded, the proof is virtually absolute that both of these parents have, by their own actions, eluded effective treatment so that neither can be entrusted with T.G.’s safety. Neither having admitted that a problem exists, neither has sought the clinically required and therapeutic solution.
Therefore, the court finds, by clear and convincing evidence, that neither can protect T.G. from themselves or each other. Without the assurance of safe custodial care, they cannot and have not adequately planned for their son’s future. And, more than a year having passed without a glimmer of hope for the birth of such a plan, this couple has sadly left this court with no choice but to declare T.G. to be a permanently neglected child.
Finally, it having been stipulated that there are no issues remaining in order to address this child’s needs, and it having been previously stipulated that only one of the options herein-above set forth would result from this trial, this court hereby terminates respondents’ parental rights to T.G. and, in accordance with Family Court Act § 631 (c), commits the guardianship and custody of him to petitioner pursuant to Family Court Act § 634, without any conditions. (See, Matter of Joyce T., 65 NY2d 39.)

. Her testimony regarding her qualifications covers about 53 pages of transcript, and it consumed about \ Vi hours of court time.

. Four of these professionals agreed with the argument of the agency that an admission of abuse by respondents is necessary for treatment to succeed.

. Dr. Adams also agreed with the previous professional testimony that successful treatment requires an admission to the sexually abusive conduct. Moreover, he too is unaware of any treatment programs which treat those who refuse to admit. Finally, he agreed that if one admits, then there is a reasonable chance that appropriate treatment will succeed, and that without treatment the condition of pedophilia will not disappear on its own.