Salem

BOBBY LEE CRUMPTON

v.

COMMONWEALTH OF VIRGINIA

No. 0453-87-3

Decided September 26, 1989

Counsel

Martin F. Clark, Jr., (Clark, Clark & Corbett, on brief), for appellant.

Eugene Murphy, Assistant Attorney General, (Mary Sue Terry, Attorney General, on brief), for appellee.

Opinion

**KOONTZ, C.J.**—In a trial by jury in the Circuit Court of Pittsylvania County, Bobby Lee Crumpton was convicted of the first degree murder of his wife. Pursuant to the jury verdict he was sentenced to life imprisonment. On appeal Crumpton raises the following issues: (1) whether Crumpton was improperly prosecuted in violation of an agreement made with the Commonwealth; (2) whether Crumpton, under the particular facts of this case, has a right to explain the circumstances that prompted him to alter his prior inconsistent statements; (3) whether evidence of the deceased's character was admissible to disprove a defense of suicide; (4) whether the trial court improperly limited the testimony of Crumpton's expert witness; (5) whether improper evidence of Crumpton's bad character was admitted; (6) whether the Commonwealth Attorney's closing argument was improper; (7) whether the jury was properly instructed; (8) whether the evidence was sufficient to prove first degree murder; and (9) whether at the post-trial hearing Crumpton proved by clear and convincing evidence that the testimony of Elvis Redd was perjured. For the reasons that follow, we reverse Crumpton's conviction and remand for a new trial. In doing so, we address only those issues raised by Crumpton which are necessarily subject to repetition upon retrial.

I. Facts.

On the evening of April 6, 1986, Bobby Lee Crumpton's wife, Lynn Ward Crumpton, died of a shotgun wound to the chest. The death occurred in the couple's home. The shotgun belonged to

Crumpton, and he was the only person present when the fatality occurred. For clarity, the details of the pertinent evidence will be related where appropriate to resolve the issues addressed in this appeal.

## II. The Agreement with the Commonwealth.

Crumpton asserts that certain officers of the Pittsylvania County Sheriff's Department separately or in conjunction with the Pittsylvania County Commonwealth Attorney promised him that if he took and "passed" a polygraph examination no charges would be brought against him for the death of his wife. Crumpton further asserts that he took and "passed" a polygraph examination and therefore the Commonwealth should have been bound by this agreement.

Neither the trial court nor this Court need decide whether Crumpton "passed" the polygraph examination. Upon evidence presented at a pre-trial hearing on this issue, the trial court found that while Crumpton took a polygraph examination the Commonwealth had not agreed not to charge Crumpton with the murder of his wife if he "passed" the examination. We hold that the trial court's finding is supported by the evidence. Accordingly, Crumpton's assertion of an agreement not to prosecute him is without merit.

## III. The Prior Inconsistent Statements and Polygraph Examination.

On April 6 and again on April 11, 1986, following the death of his wife, Crumpton gave the police authorities recorded statements in which he asserted that the death resulted from an accident while his wife was holding and cleaning his shotgun. While no charges were brought against Crumpton at that time, the authorities continued their investigation. On July 11, 1986, Crumpton willingly took a polygraph examination. Upon completion of the polygraph examination, Crumpton altered his prior statements, and, for the first time, asserted that his wife had committed suicide rather than having died by an accident. Crumpton was indicted for the murder of his wife on October 26, 1986.

At trial, Crumpton's inconsistent statements and the polygraph examination became issues which arose repeatedly in different

procedural contexts. As we have previously noted, in a pre-trial hearing Crumpton first asserted that he had an agreement with the Commonwealth that if he "passed" the polygraph examination no criminal charges would be brought against him. For the reasons previously stated, the trial court correctly determined that no such agreement existed. At that time the court did not rule on the admissibility of the polygraph evidence as it might relate to future incidents of the trial. During the trial, counsel for Crumpton, for reasons not apparent from the record, alternately referred to Crumpton's statements as "confessions" and "statements" and took several contradictory positions regarding the admissibility of these statements and the evidence relating to the polygraph examination. Counsel argued that Crumpton had no objection to the admission of his statements and that the polygraph evidence was admissible to show his "state of mind." Further, counsel argued that evidence of the "results" of the polygraph was admissible on the issue of voluntariness of the statements, although counsel also stated that he did not intend to offer evidence of the results of the polygraph. These contradictory and at best confusing positions taken by defense counsel provide the procedural background in which the issue we address here arose.

As the trial court noted, the "general issue" of the polygraph examination had been raised from the first day of the trial. Ultimately, during the Commonwealth's case-in-chief in a hearing out of the presence of the jury, the trial court was advised that Crumpton intended to testify concerning the circumstances surrounding his giving of the July 11 statement and specifically his reasons for altering his prior inconsistent statements. Crumpton asserted that he had a right to testify that he had been assured by the police authorities that if he told them "exactly what happened" the public and especially his father-in-law, a prominent member of the local community, would not be told what happened. Crumpton maintained that he and his father-in-law were "the best of friends." Crumpton further asserted that upon completion of the polygraph examination George Watts, the polygraph examiner employed by the Virginia State Police, told him that the polygraph examination indicated that Crumpton was not lying when Crumpton said that he did not kill his wife. In the context that he had been assured that his father-in-law would not be told what happened and that the police authorities believed he did not kill his wife, Crumpton asserted that he altered his prior

statements and gave the statement that his wife had committed suicide. The trial court ruled that the results of the polygraph examination were not admissible and that Crumpton could not "testify at any time that you testify about a polygraph or results of a polygraph test."

Subsequently, the Commonwealth introduced all three of Crumpton's statements. Following the conclusion of the Commonwealth's case, Crumpton testified and continued to assert that his wife's death resulted from suicide. Pertinent to his prior inconsistent statements, Crumpton was permitted to testify that the police had promised him if he told them exactly what happened "the case would be closed and the public and especially [his wife's father] would not be told what happened." He was also permitted to testify that George Watts "had information that said that I did not shoot my wife" and that for these reasons he had changed his account of the death. Crumpton was not permitted to testify that George Watts was a polygraph examiner or that the "information" allegedly possessed by Watts came from or concerned a polygraph examination. In short, consistent with the trial court's ruling, Crumpton was not permitted to testify "about a polygraph or results of a polygraph test."

 To the extent that the trial court ruled that the results of the polygraph examination were not admissible, we agree. The law of this Commonwealth on that point is clear:

> [P]olygraph examinations are so thoroughly unreliable as to be of no proper evidentiary use whether they favor the accused, implicate the accused, or are agreed to by both parties. The point . . . is that the lie-detector or polygraph has an aura of authority while being wholly unreliable.

*Robinson v. Commonwealth*, 231 Va. 142, 156, 341 S.E.2d 159, 167 (1986)(citations omitted). The rule is so firmly embedded in our law that even "[e]vidence of a person's willingness or unwillingness to submit to a polygraph examination is inadmissible." *Gray v. Graham*, 231 Va. 1, 10, 341 S.E.2d 153, 158 (1986); *see also Taylor v. Commonwealth*, 3 Va. App. 59, 348 S.E.2d 36 (1986)(holding that to conclude an unreliable test can yield results which are definite and conclusive is a *non sequitur* and therefore polygraph results are inadmissible even under a stipulation by the parties that the results will be admissible if not shown

to be indefinite or inconclusive). We do not retreat from or attempt to create exceptions to this clear precedent. An unreliable test cannot determine the truth; that determination is properly left to the judge or jury as the fact finder.

■ The application of the rule barring the polygraph examination *results*, however, does not resolve the issue presented by this appeal. Just as firmly embedded in our law as the rule against the admissibility of polygraph examination results is the rule that "[a] witness may be allowed to explain a prior inconsistent statement, and his explanation should be received and considered by the jury." *Brown v. Peters*, 202 Va. 382, 389, 117 S.E.2d 695, 699 (1961). A witness must be permitted to explain a prior inconsistent statement because his credibility as a witness at trial may be impeached by the fact that he made statements inconsistent with his trial testimony. The weight and credibility of a witness' testimony are for the jury to determine, and that determination, as we have previously held, may not be usurped by an unreliable polygraph examination. Nevertheless, in this case the polygraph examination and the alleged statements made by the polygraph examiner were a part of Crumpton's explanation for altering his prior inconsistent statements concerning his wife's death. In this context, we must reconcile these two rules as they apply to the specific facts of this case.

Crumpton was the sole witness to the death of his wife. The Commonwealth's evidence tending to prove that she died as a result of a criminal act of Crumpton, with the exception of certain statements alleged to have been made by Crumpton to Elvis Redd,[1] was wholly circumstantial. While admittedly inconsistent, Crumpton's statements to the police authorities as well as his trial testimony were not admissions or confessions of criminal culpability. Similarly, the Commonwealth did not offer these statements for the truth of the content of the statements. Obviously, the Commonwealth did not intend to prove either accident or suicide as the cause of death. However, because these statements were offered into evidence by the Commonwealth when Crumpton subsequently testified, his credibility as a witness was called in question by them. Crumpton's credibility was critical to the ultimate

---

[1] Crumpton denied making any incriminating statements to this witness. While we do not address the testimony of this witness, Crumpton's denial also concerns the issue of Crumpton's credibility as a witness.

issue to be determined by the jury, which was whether Crumpton was telling the truth when he testified that his wife committed suicide. Moreover, once Crumpton's credibility was called into question by the admission of his prior inconsistent statements, Crumpton's reasons and the circumstances attendant to his giving those statements were just as critical to the jury's determination of his credibility as the fact that he had made them.

In reconciling Crumpton's right to explain his prior inconsistent statements with the rule prohibiting the admission of polygraph examination evidence, we begin with the premise that these rules are not inherently contradictory; that is, they may be reconciled so that the objectives of both rules are fulfilled. In our view, under the particular facts and procedural posture in which the application of these rules arose in this trial, Crumpton had a right to give a full explanation of his prior inconsistent statements so long as that explanation did not also necessarily invoke the polygraph examination results as proof that he had been truthful when he stated that his wife committed suicide.

It is clear from the record that Crumpton was not permitted to give a full explanation of his prior inconsistent statements. He was permitted to testify that the police authorities had promised him essentially that if he told the truth the case would be closed and the public and his father-in-law would not be told what happened. This, however, was only part of his explanation and perhaps the least significant part. A more significant part of his explanation was the fact that he altered his prior statements at the conclusion of a polygraph examination under circumstances in which he asserted that he had been assured by the police authorities that they believed he was truthful when he stated that he did not shoot his wife. Without explaining that George Watts was a polygraph examiner and that whatever "information" Watts had came from his interpretation of the polygraph examination, the jury could not have appreciated the significance of this evidence. Moreover, without any reference to "results" of the polygraph examination, coupled with an appropriate cautionary instruction from the court that no inference favorable or unfavorable to Crumpton should be drawn from the reference to the polygraph examination, Crumpton could and should have been permitted to fully explain the surrounding circumstances and reasons for which he gave his July 11 statement which was introduced by the Commonwealth.

Such a procedure would have preserved both the integrity of the rule prohibiting the admissibility of polygraph results and the integrity of the rule permitting Crumpton to give a full explanation of his prior inconsistent statements. For these reasons we hold that the failure to permit Crumpton to give a full explanation of his prior inconsistent statements was error.

Finally, we disagree with the Commonwealth's assertion that Crumpton has shown no prejudice. Error will be presumed to be prejudicial unless it plainly appears that it could not have affected the result. *Sargent v. Commonwealth*, 5 Va. App. 143, 155, 360 S.E.2d 895, 902 (1987). The Commonwealth attacked Crumpton's credibility with his prior inconsistent statements. We cannot determine that a full explanation under the limitations set out above rather than Crumpton's restricted explanation would not have affected the jury's determination of Crumpton's credibility and ultimately his guilt or innocence of the charge against him.

For these reasons, we reverse Crumpton's conviction and remand for a new trial consistent with the holding of this opinion.

*Reversed and remanded.*

Coleman, J., and Hodges, J., concurred.