BENTON, J.,
concurring, in part, and dissenting, in part.
I concur with the majority’s holding regarding the first two issues raised on appeal. I dissent, however, from the holding on the third issue because I believe that plethysmographs are as unreliable as polygraphs. I would hold that the trial judge erred by permitting plethysmograph results into evidence as a factor in assessing punishment upon Matthew Edward Billips. Therefore, I would reverse the sentences and remand for re-sentencing.
“Generally, when a specific objection is made to evidence or when inquiry is made by the trial judge concerning the purpose of evidence, the proponent of the evidence has the burden of establishing its admissibility.” Neal v. Commonwealth, 15 Va.App. 416, 420, 425 S.E.2d 521, 523 (1992) (citing 1 Wigmore On Evidence §§ 14.1, 17, and 18 (Tillers rev. 1983)). Indeed, the Supreme Court of Virginia repeatedly has predicated the trial judge’s admission of scientific evidence upon the proponent of the evidence establishing its reliability. See Spencer v. Commonwealth, 238 Va. 275, 290, 384 S.E.2d 775, 783 (1989) (ruling that DNA testing was admissible because evidence established the scientific technique’s reliability); O’Dell v. Commonwealth, 234 Va. 672, 695-97, 364 S.E.2d 491, 504-05 (1988) (ruling that electrophoresis blood testing was admissible because it was reliable and generally accepted in the field of forensic science); Lee v. Commonwealth, 200 Va. 233, 237, 105 S.E.2d 152, 155 (1958) (holding that lie detector test results were inadmissible because such tests generally have not been proved scientifically reliable).
The Commonwealth failed to establish that the plethysmograph is reliable as a measure of the responses it purports to test—sexual preference and behavior. Like the polygraph, it purports to be an accurate measure of a psychological state as indicated by physiological responses. In view of the poly *309 graph’s unreliability, Virginia bars polygraph evidence from court proceedings.[6] See Robinson v. Commonwealth, 231 Va. 142, 156, 341 S.E.2d 159, 167 (1986) (holding that the trial judge properly excluded polygraph results to be used for impeachment purposes). In doing so, the Supreme Court of Virginia held as follows:
In a long line of cases ... we have made clear that polygraph examinations are so thoroughly unreliable as to be of no proper evidentiary use whether they favor the accused, implicate the accused, or are agreed to by both parties. The point of these cases is that the lie-detector or polygraph has an aura of authority while being wholly unreliable.
Id. (citations omitted); see also Odum v. Commonwealth, 225 Va. 123, 132, 301 S.E.2d 145, 150 (1983) (holding that polygraph results are inadmissible “in any hearing relating to the prosecution of defendant” even though parties stipulated the results could be introduced). “The rule [barring evidence of *310 polygraph results] is so firmly embedded in our law that even ‘[e]vidence of a person’s willingness or unwillingness to submit to a polygraph examination is inadmissible.’ ” Crumpton v. Commonwealth, 9 Va.App. 131, 135-36, 384 S.E.2d 339, 342 (1989) (quoting Gray v. Graham, 231 Va. 1, 10, 341 S.E.2d 153, 158 (1986)); see also Taylor v. Commonwealth, 3 Va.App. 59, 62, 348 S.E.2d 36, 37 (1986) (holding an unreliable test cannot yield definite and conclusive results, and therefore polygraph results are inadmissible even under an agreement by the parties that the results will be admissible if not shown to be indefinite or inconclusive).
Relying on “ ‘a long line of cases,’ ” from the Supreme Court “ ‘spanning almost thirty years,’ ” we have held that polygraph results are not admissible even during revocation proceedings, where the evidentiary standard is lessened. White v. Commonwealth, 41 Va.App. 191, 194, 583 S.E.2d 771, 772-73 (2003) (quoting Robinson, 231 Va. at 156, 341 S.E.2d at 167). Indeed, Virginia law does not distinguish between different phases of trial when considering the admissibility of polygraphs. That is so because “[a]n unreliable test cannot determine the truth; that determination is properly left to the judge or jury as the fact finder.” Crumpton, 9 Va.App. at 136, 384 S.E.2d at 342.
The use of plethysmographs implicates these same concerns. Plethysmographs are a phallometric test conducted by placing a metal gauge over the subject’s penis that measures variations in the penis’s size. During the session, the subject is exposed to a variety of visual and audio sexual depictions of males and females of different ages, in both consenting and non-consenting situations. The theory behind the plethysmograph is that it directly measures erotic response to the different stimuli, indicating what the subject finds sexually exciting. See Judith V. Becker & William D. Murphy, Sex Offenders: Scientific, Legal, and Policy Perspective: The Science of Sex Offenders: Risk Assessment, Treatment, and Prevention: What We Know and Do Not Know About Assessing and Treating Sex Offenders, 4 Psych. Pub. Pol. & L. 116, 122 (Mar./June 1998).
*311 In United States v. Powers, 59 F.3d 1460, 1471 (4th Cir.1995), the court noted that “the scientific literature addressing penile plethysmography does not regard the test as a valid diagnostic tool because, although useful for treatment of sex offenders, it has no accepted standards in the scientific community.” See also Berthiaume v. Clark, 142 F.3d 12, 14-15 (1st Cir.1998) (examining the apparent scientific debate over the usefulness of plethysmographs). In North Carolina v. Spencer, 119 N.C.App. 662, 459 S.E.2d 812, 815 (1995), the government’s expert explained that although the plethysmograph accurately measures the increase of blood to the penis, there was “substantial disagreement” over whether the physical reaction directly correlates to sexual behavior. The North Carolina Court of Appeals rejected the use of the plethysmograph, noting that “there is a substantial difference of opinion within the scientific community regarding the plethysmograph’s reliability to measure sexual deviancy.” Id. (citing e.g., James G. Barker & Robert J. Howell, The Plethysmograph: A Review of Recent Literature, 20 Bull. Am. Acad, of Psychiatry & L. 13 (Mar. 1992) (identifying several problems with the reliability of the plethysmograph, namely “lack of standards for training and interpretation of data, lack of norms and standardization and susceptibility of the data to false negatives and false positives,” and concluding that “despite the sophistication of the current equipment technology, a question remains whether the information emitted is a valid and reliable means of assessing sexual preference”)).
An expert testified in another case that “the penile plethysmograph, though it can be helpful in treating sexual deviance, is not a reliable means of assessing sexual deviance.” Nelson v. Jones, 781 P.2d 964, 969 (Alaska 1989); see also Berthiaume, 142 F.3d at 14-15 (where the expert testified that plethysmographs are “not useful to identify pedophilia because the test has a high rate of false negatives”); Cooke v. Naylor, 573 A.2d 376, 379 (Me.1990) (upholding the rejection of the plethysmograph where “experts testified that these tests are of questionable reliability even in establishing a correct pedophilic or non-pedophilie profile for the individual undergoing evaluation”). Another expert criticized plethysmographs be *312 cause they have “not gained acceptance by the scientific community as a reliable predictor of future behavior.” Dutchess County Dep’t of Soc. Servs. v. G., 141 Misc.2d 641, 534 N.Y.S.2d 64, 69 (N.Y.Fam.Ct.1988); see also Gentry v. Georgia, 213 Ga.App. 24, 443 S.E.2d 667, 669 (1994) (holding that the plethysmograph was inadmissible in Georgia because the reliability of the method had not been established and because of the uncertainty of its reliability within the scientific community).
Skepticism over the plethysmograph is understandable. One study reported that “only 50% of child molesters display deviant arousal patterns on the test,” and another found that “a large percentage of non-sex offenders display some degree of arousal to stimuli involving young children.” Jason R. Odeshoo, Of Penology and Perversity: The Use of Penile Plethysmography on Convicted Child Sex Offenders, 14 Temp. Pol. & Civ. Rts. L.Rev. 1, 11-12 (Fall 2004). An additional concern about the plethysmograph’s reliability and accuracy is that the subject can manipulate the results. See In the Interest of A.V., 849 S.W.2d 393, 399 (Tx.App.1993) (the expert attempting to validate the method “admitted that a person of high intelligence ... can easily manipulate the results”); see also United States v. Birdsbill, 243 F.Supp.2d 1128, 1133 (D.Mont.2003) (briefly reviewing expert testimony about the susceptibility of plethysmographs to “faking”); North Carolina v. Spencer, 459 S.E.2d at 815 (noting that a study indicates penile response is subject to voluntary control). Some subjects can exhibit responses to non-preferred stimuli as well as reduce response to preferred stimuli. Grant T. Harris, Marnie E. Rice, & Vernon L. Quinsey, Sex Offenders: Scientific, Legal and Policy Perspective: The Science of Sex Offenders: Risk Assessment, Treatment, and Prevention: Appraisal and Management of Risk in Sexual Aggressors: Implications for Criminal Justice Policy, 4 Psych. Pub. Pol. & L. 73, 79 (Mar./June 1998).[7]
*313 In sum, the available data about plethysmographs reveals a scientific community dramatically divided over their reliability and accuracy. The studies of plethysmographs vary drastically in their conclusions. Some reports show an extremely fallible method, susceptible to manipulation from the subject and often misidentifying the subject as a sex-offender or as a non-offender, while other studies report high accuracy rates. In this respect, plethysmographs and polygraphs, both of which measure physiological responses, are similar. Both require an assumption that the physiological response measured directly reflects the emotion and behavior purportedly being measured.
For these reasons, I believe that plethysmographs, like polygraphs, “are so thoroughly unreliable as to be of no proper evidentiary use.” See Robinson, 231 Va. at 156, 341 S.E.2d at 167. Like polygraphs, the plethysmograph “has an aura of authority while being wholly unreliable.” Id. It is well established that reliability of evidence offered in a criminal proceeding is a due process concern. See Chambers v. Mississippi, 410 U.S. 284, 294, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973) (holding that “[t]he right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State’s accusations”). Therefore, I would hold that the trial judge erred by allowing the plethysmograph results into evidence when determining the punishment to assess upon Billips, and I would reverse and remand for re-sentencing upon proper evidence.

. After decades of debate, the scientific community still has not agreed on the reliability of polygraphs, despite numerous studies on the question. See United States v. Scheffer, 523 U.S. 303, 309, 118 S.Ct. 1261, 1264-65, 140 L.Ed.2d 413 (1998); see also 4 David L. Faigman, David H. Kaye, Michael J. Saks, & Joseph Sanders, Modem Scientific Evidence §§ 40:20 to 40:118, at 571-655 (2005) (discussing and analyzing the two sides of the continuing polygraph debate in the scientific community). While some studies concluded that polygraphs are highly accurate, others reported 50 and 51% accuracy rates. See Scheffer, 523 U.S. at 309, 118 S.Ct. at 1264—65 (citing S. Abrams, The Complete Polygraph Handbook 190-91 (1989); William G. Iacono & David T. Lykken, The Scientific Status of Research on Polygraph Techniques: The Case Against Polygraph Tests, in 1 Modern Scientific Evidence § 14—5.3 (1997)); see also 1 John W. Strong, McCormick on Evidence § 206, at 629 (5th ed. 1999) (summarizing the results of various studies conducted on polygraph reliability). One of the serious, lingering concerns about polygraphs is that an individual can "trick” the machine and receive a negative result despite lying. See Strong, supra (explaining the concern that " ‘coaching’ and practicing would become more commonplace if the evidence were generally admissible”). "Although the degree of reliability of polygraph evidence may depend upon a variety of identifiable factors, there is simply no way to know in a particular case whether a polygraph examiner’s conclusion is accurate, because certain doubts and uncertainties plague even the best polygraph exams." Scheffer, 523 U.S. at 312, 118 S.Ct. at 1266.

. As with polygraphs, the debate has proponents of the use of plethysmographs. See North Carolina v. Spencer, 459 S.E.2d at 815 (referenc *313 ing a study reporting 95% accuracy); Dutchess County Dep’t of Soc. Servs., 534 N.Y.S.2d at 68 (where a study reported 85 to 90% accuracy); see also Micheal C. Seto, Grant T. Harris, Marnie E. Rice, & Howard E. Barbaree, The Screening Scale for Pedophilic Interests Predicts Recidivism Among Adult Sex Offenders With Child Victims, 33 Archives of Sexual Behav. 455 (2004) (stating that phallometric testing consistently detects sex offenders).