**Paul A.L. NELSON, Appellant,**

v.

**Loretto L. JONES, Appellee.**

No. S–2077.

Supreme Court of Alaska.

Oct. 27, 1989.

Loren Domke, Domke & Olmstead, P.C., Juneau, for appellant.

Thomas W. Findley, Findley & Pallenberg, Juneau, for appellee.

Barbara T. Walker, Juneau, Guardian Ad Litem.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

COMPTON, Justice.

This appeal arises from the divorce of Paul Nelson and Loretto Jones. In January 1987 the trial court entered a decree of divorce resolving issues of child custody, visitation, and property division. The decree incorporated a stipulation, which provided in part: "The court finds clear and convincing evidence that T was sexually abused by her father, Paul Nelson." The stipulation conditioned Paul's right to supervised visitation on his treatment by Dr. Anthony M. Mander, a psychologist. Paul moved to set aside the decree, and his motion was denied. When Paul refused to admit in treatment to abusing his daughter, Dr. Mander terminated treatment, and Loretto denied visitation. Paul then moved to modify the court's decree as to visitation, and his motion was denied.

Paul appeals the denial of his motions to set aside and to modify the judgment. He also appeals the court's property division and award of attorney fees. We affirm.

## I. STATEMENT OF FACTS

Paul Nelson and Loretto Jones were married in March 1983. Their only child, T, was born in April 1983. The couple separated in May 1985, and Paul filed for divorce.

In the summer following the parties' separation, Loretto frequently left Haines to fish commercially in nearby areas. As a result, T spent most of the summer in Paul's care. Each workday Paul left T with a babysitter, Mary Benson. One morning in September, Benson was giving T a bath when T, without any prompting from Benson, pointed to her genital area and stated, "My daddy touched me here with his finger and he made my tummy hurt." Benson said, "What?" T repeated her statement and again pointed to her genital area. At Benson's prompting, T later repeated the statement to Benson's husband.

When Loretto returned from fishing a few days later, Benson did not tell her of the incident. Loretto apparently learned of the abuse from T soon after. She took T to Dr. Claudia Foster–Olson, who examined her. Dr. Foster observed that T had an enlarged hymeneal diameter and vaginal orifice. These and other observations led Dr. Foster to conclude that T had been subjected to repeated sexual abuse. A second physician, Dr. Dennis Batey, examined T some time later and reached the same conclusion.

The trial court heard evidence on issues of child custody and property division in November 1986. In support of her request for custody, Loretto introduced evidence that T had been sexually abused by Paul.

Paul introduced the testimony of two babysitters, Erma Schnabel and Edith Braaten. Each testified that T's vagina had been unusually large since soon after her birth.

After three days of testimony, the parties submitted a stipulation in the form of an order on the issues of custody and visitation. The parties' stipulation left for the court only the valuation and division of marital property.

The stipulated order provided that "the court finds clear and convincing evidence that T was sexually abused by her father." The order further provided that Paul should have supervised visitation with T and required that Paul enter counselling with Dr. Mander. Asked in open court if he approved the stipulation, Paul stated, "Yes ... with the understanding it's not an admission of guilt."

On January 5, 1987, the trial court entered a memorandum decision and order which incorporated the parties' stipulation on the issues of custody and visitation. The order also resolved the disputed issues of property division and attorney fees.

Soon after the order was entered Paul moved to set aside the custody stipulation and reopen trial evidence. He submitted

affidavits in support of his motion. He also moved for reconsideration on the issues of property division and attorney fees.

In an affidavit submitted in support of Paul's motion to reopen, Dr. William McIver opined that certain interviews with T had been improperly conducted. Another affiant, Dr. Robert Fay, opined that hymeneal diameter measurements cannot unequivocally establish that penetration has occurred. Dr. Eugenia Gullick and Dr. Henry Adams stated that their tests of Paul, involving penile plethysmographs and psychometic and clinical evaluations, revealed no evidence of an arousal pattern consistent with pedophilia. Donald Albright, Loretto's former business partner and former lover, suggested in his affidavit that Loretto had fabricated the charges of abuse as a means of obtaining a favorable property settlement. Finally, other affidavits were offered to prove that Nelson's consent to the stipulation was the result of duress and ineffective assistance of counsel.

On January 20, the trial court denied Paul's motion for reconsideration, and later entered final judgment in accordance with its earlier order. On February 5, the court denied Paul's motion to set aside the stipulation and reopen evidence. Paul filed a notice of appeal.

In early February Dr. Mander terminated his treatment of Paul on the ground that he could not help Paul until Paul admitted to abusing T. Loretto thereafter refused to allow Paul visitation with T. Paul moved to modify the visitation order, requesting that another psychiatrist be substituted for Dr. Mander.

In April the trial court heard additional testimony on Paul's motion. Drs. Adams and Gullick repeated their opinions. On cross-examination, each conceded that the tests performed on Paul could not establish with certainty that he had not abused his daughter. Paul conceded at the April hearing that T had been abused, but denied that it was he who had abused her. He said that he had formed an opinion as to the identity of the abuser, but declined to state his opinion.

Loretto offered the testimony of Florence Wolfe. Ms. Wolfe, a counsellor specializing in the treatment of sexual deviance, testified that the penile plethysmograph was susceptible to cheating. She further testified that the plethysmograph was useful in the treatment, but not in the assessment, of sexual deviance.

This court temporarily remanded the case for consideration of Paul's motion. In September the trial court entered a memorandum and order denying Paul's motion for modification.

In December Paul moved to recuse Judge Pegues from presiding at any additional hearings in this case. Judge Pegues denied the motion. Paul appeals.

## II. DISCUSSION

### A. CHILD CUSTODY AND VISITATION

1. The trial court did not abuse its discretion in denying Paul's motion to reopen evidence and his motion to set aside the judgment.

On January 5, 1987, the trial court entered a memorandum decision and order based in part on the parties' stipulation. On January 8, Paul moved the court to reopen evidence, basing his motion on Alaska Civil Rule 59.[1]

When the court entered final judgment on January 23, Paul converted his motion to a motion under Civil Rule 60 to set aside the judgment.[2] In support of his motion,

---

**1.** Civil Rule 59 provides in part:

A new trial may be granted to all or any of the parties and on all or part of the issues in an action in which there has been a trial by jury or in an action tried without a jury, if required in the interest of justice. On a motion for a new trial in an action tried without a jury, the court may take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.

**2.** Civil Rule 60(b) provides in part:

On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons:

Paul argued that (1) he had agreed to the custody stipulation under duress, (2) he had "received ineffective assistance of counsel," and (3) further expert testimony should be heard in the interest of justice.

The trial court denied Paul's motion, holding that the test results to which the experts would testify were likely in error and likely would not change the trial result. The court disbelieved Paul's claim of duress: "the court was present for part of the drafting of the agreement, and Nelson showed no sign of duress or unusual stress."[3]

■ Denial of relief under Civil Rule 59 or Rule 60 will be overturned on appeal only if the trial court has abused its discretion. *Gregor v. Hodges*, 612 P.2d 1008, 1010 (Alaska 1980); *National Bank of Alaska v. McHugh*, 416 P.2d 239, 244 (Alaska 1966).

■ The court concluded that Paul had failed to show duress. Paul asserted: "[My] attorney told me that if the court accepted Dr. Foster's testimony and there was no negotiated agreement on custody it was very likely I would not see my daughter for a year." This assertion is directly contradicted by Paul's attorney. Further, the court had an opportunity to observe Paul at the drafting of the stipulation, commenting thereon in its decision.

> (1) mistake, inadvertence, surprise or excusable neglect;
> (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b);
> (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party;
> (4) the judgment is void;
> (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or
> (6) any other reason justifying relief from the operation of the judgment.

**3.** The court did not specifically address Paul's claim of "ineffective assistance of counsel." In support of his argument, Paul cited a number of

The court also found that "Paul's new evidence would not probably change the trial results."[4] Although Paul's stipulation was not binding on the trial court, it nonetheless constituted evidence on the issue of abuse. *See McClain v. McClain*, 716 P.2d 381, 385–87 (Alaska 1986); *Cope v. Cope*, 49 Or.App. 301, 619 P.2d 883, 887 (1980), *aff'd* 291 Or. 412, 631 P.2d 781 (1981). Taken in combination with the evidence at trial, its force would be difficult to counter. The affidavits offered by Paul are not equal to the test. As the trial court remarked in discussing the penile plethysmograph, "tests often give false results, both positive and negative." Cases from other jurisdiction suggest that the court's doubts were well founded.[5] *See People v. John W.*, 185 Cal.App.3d 801, 229 Cal.Rptr. 783, 785 (1986) (court held that criminal defendant had failed to establish that the plethysmograph "was a reliable means of diagnosing sexual deviance" and ruled the test inadmissible); *Dutchess Cty. Dept. of Social Services v. Mr. G.*, 141 Misc.2d 641, 534 N.Y.S.2d 64, 71 (1988) ("the results of the plethysmograph as a predicator of human behavior cannot be considered. The proof establishes that it is not only a device with, at best, questionable professional recognition, but one whose conceded margin of error is too great to reliably forecast [the child's] safety.").[6]

We conclude that the trial court did not abuse its discretion in denying Paul's mo-

criminal cases and malpractice cases. None of these cases suggests that "ineffective assistance of counsel" is a ground for setting aside a civil judgment.

**4.** In order to support a Rule 59 or Rule 60 motion, newly discovered evidence must be such as would probably change the result of a new trial. *Cleary Diving Service v. Thomas, Head and Greisen*, 688 P.2d 940, 943 (Alaska 1984). *Nat'l Bank of Alaska*, 416 P.2d at 244.

**5.** Reference to legal authority from other jurisdictions is an acceptable means of considering the reliability of testing methods. *See, e.g., Pulakis v. State*, 476 P.2d 474, 478 (Alaska 1970) (survey of legal and scientific judgments regarding polygraph tests).

**6.** By coincidence, Dr. Henry Adams, who testified on Paul's behalf, also testified on the father's behalf in *Mr. G. Id.* 534 N.Y.S.2d at 68.

tions to reopen evidence or set aside the judgment.

2. The trial court did not abuse its discretion in denying Paul's motion to re-establish visitation.

In April 1987 Paul moved the court to re-establish supervised visitation. He argued that because he had not abused his daughter, he could not comply with Dr. Mander's request that he admit to abusing her. Paul asked that Dr. Wildeman, a psychiatrist, be allowed to serve in the place of Dr. Mander.

The trial court found that Paul had chosen not to comply with conditions of visitation, and that his motion therefore should be treated as a motion to modify, rather than to enforce, visitation. After hearing further evidence, the trial court again concluded that Paul had abused T. It also concluded, on the basis of expert testimony, that visitation would be harmful to T as long as Paul continued to deny the abuse. The court denied Paul's motion.

On appeal Paul contends that the trial court abused its discretion in denying his motion. He contends that the record does not support the court's finding of abuse. He also apparently contends that even if he did abuse T, supervised visitation would not be harmful to T.

■ The trial court's decision to deny Paul's motion for modification should be reversed only if the trial court abused its discretion. *Cooper v. State*, 638 P.2d 174, 179 (Alaska 1981).

By conceding at the April hearing that T had been abused, Paul added to the weight of evidence against him. The expert testimony of Drs. Gullick and Adams may be viewed as effectively rebutted by that of Florence Wolfe, who testified that the penile plethysmograph, though it can be helpful in treating sexual deviance, is not a reliable means of assessing sexual deviance. Thus, the court did not err in finding again that Paul had abused his daughter.

■ A more difficult question is whether, in light of its finding of abuse, the trial court abused its discretion in conditioning further visitation by Paul upon his admission that he abused T. We cannot ignore the possibility, however remote, that Paul did not abuse his daughter. If he did not abuse his daughter, the trial court's decision places him in a difficult position: unless he admits to acts he did not commit, he will be denied visitation with his daughter.

Though the trial court's order is severe, its severity is justified by the overriding need to protect T from further harm. Dr. Wildeman and Ms. Wolfe each testified at the April hearing that visitation by an abuser in denial can be harmful to the abused child. Mrs. Wolfe opined that abusive conduct can occur even during carefully supervised visits.

The trial court observed, "[p]ast experience with [Paul] shows that he will not follow the rules of supervision, that he will attempt—using counsel when necessary—to overcome and defeat controls placed upon him by the supervisor." During and after the divorce dispute, Paul violated the court's orders by initiating or encouraging physical contact between him and T. During a visit in January 1987, a supervisor asked Paul to refrain from photographing T. Paul questioned the restriction and questioned the supervisor's assumption that he was a pedophile. Later, at Paul's request, his attorney sent a letter to the supervisor. The letter demanded a scientific basis for the restriction and demanded information on the supervisor's training and education. It stated, "Mr. Nelson conclusively passed a lie detector examination.... The polygraph results establish that Mr. Nelson did not sexually abuse his daughter." The letter further stated: "you can be assured that Mr. Nelson will take all steps necessary to protect his reputation."

Expert testimony and Paul's behavior both suggest that even supervised visitation could be harmful to T. The trial court did not clearly err in concluding that "the risk of continuing, long lasting emotional harm to T from contact with Nelson while he remains in denial is too great to be tolerated." The trial court

therefore did not abuse its discretion in conditioning future visitation upon admission by Paul that he abused T.[7]

## B. PROPERTY DIVISION

The trial court found that the property subject to division consisted of: (1) the increase in value of Bigfoot Auto, a corporation of which Paul is a 65% shareholder; (2) money held for T's benefit; (3) the fishing vessel "Small Fry"; (4) fishing gear; and (5) a commercial fisheries entry permit for the drift gillnet fishery in Southeast Alaska.

The trial court awarded Loretto the Small Fry, the permit, and the fishing gear. It found that during the course of the marriage the Small Fry had increased in value by $12,500, the permit by $6,000 and the gear by $2,500.

The trial court awarded Paul his interest in Bigfoot Auto. The court found that the increase in value of Paul's share of the business exceeded the $21,000 by which the boat, permit and gear had increased in value. The court found that Paul had received, as a result of its award, the greater part of the couple's marital property. The court found that this division was justified by (1) its treatment of attorney fees, (2) the short duration of the marriage, and (3) Paul's contribution of pre-marital assets to the marriage.

In its divorce decree, the court awarded Loretto actual attorney's fees in the amount of $28,112.53. Following the April hearing on Paul's motion for modification of visitation, the court awarded Loretto additional attorney fees.

1. The trial court did not err in its valuation of Paul's business.

At trial Paul's expert witness testified that the "book value" of Paul's share of Bigfoot Auto increased by $7,021.00. Loretto introduced no expert testimony on the value of the business. The trial court apparently based its valuation on the corporation's federal income tax returns and on the expert's testimony on cross-examination.

Paul contends the court erred in finding that his share of Bigfoot Auto increased in value during the marriage by more than $21,000. He contends that the trial court's valuation was without evidentiary basis.

A trial court's valuation of marital property is reviewed only for clear error. *Moffitt v. Moffitt*, 749 P.2d 343, 346 (Alaska 1988). A decision is clearly erroneous where this court is left with a definite and firm conviction on the entire record that a mistake has been made. *Martens v. Metzger*, 591 P.2d 541, 544 (Alaska 1979).

In valuing a marital asset, the court should look to the asset's fair market value. *Richmond v. Richmond*, 779 P.2d 1211, 1214–15 (Alaska 1989).

Paul's expert, Mr. Kennedy, conceded that the "book value" of a corporation bears little relation to its fair market value. Thus, his testimony on direct examination was not relevant to the issue before the court.

On cross-examination, Mr. Kennedy testified to the following facts: In 1983 gross sales for Bigfoot Auto were $245,000; in 1984, $352,652; in 1985, $450,734. Between 1983 and 1985, indebtedness on the business decreased from $141,000 to $80,000. Over the same period, the corporation spent about $57,000 on improvements to the building which houses the business. The corporation's retained earnings increased by about $55,000.

The trial court concluded that the corporation's "reduction of debt and addition of assets, including its unappropriated retained earnings," showed that Paul's equity interest in the corporation had in-

---

7. This result finds support in *Dutchess County Department of Social Services v. Mr. G.*, 141 Misc.2d 641, 534 N.Y.S.2d 64 (1988). In *Mr. G.*, the court considered whether the parents' "refusal to admit, in counseling, that they committed any incestuous acts, can form the sole factual basis for a termination of their parental rights." *Id.* 534 N.Y.S.2d at 65. The court observed that in a number of cases "refusal to admit abuse has been a persuasive factor in restricting parental rights." *Id.* at 70. The court held that the need to prevent harm to the child overrode all other considerations, and it terminated the parents' rights.

creased by more than $21,000. This conclusion is not clearly erroneous.[8]

2. The trial court did not abuse its discretion in awarding attorney fees to Loretto.

Following trial the court awarded Loretto actual attorney fees of $28,112.53. Following the April hearing on Paul's motion for modification, the court awarded Loretto additional attorney fees.[9] In each case the trial court based its award on the parties' relative economic situations and earning power.[10]

■ Paul contends that each of the trial court's awards of attorney fees constituted an abuse of discretion. As to the first award, Paul argues only that his request for custody was not frivolous and vexatious. Since the court's award was premised on economic disparity, his challenge is without merit.

As to the second award, Paul argues in part that the court's award unfairly burdened his pursuit of T's best interests.

■ The trial court applied the "divorce judgment standard" to Loretto's second request for attorney fees; that is, it considered the relative economic situations of the parties rather than prevailing party status. Neither the divorce judgment standard nor the prevailing party standard is appropriate in an action to modify or enforce a visitation order. *L.L.M. v. P.M.*, 754 P.2d 262, 264–65 (Alaska 1988). Instead the trial court should consider whether the unsuccessful party has acted reasonably and in good faith. *Id.* Therefore, the

trial court applied the wrong standard to Loretto's request for attorney fees. Nevertheless, we uphold the court's award.[11]

■ Following the April hearing, the trial court found: "it remains clear, by at least clear and convincing evidence, and in this court's view by evidence beyond a reasonable doubt, that Nelson ... sexually abused [T]." The court dismissed Paul's theories as "patently incredible," and remarked that he had "purposely withheld information ... and given lame rationalizations for doing so." Finally, the court stated:

Nelson, perhaps because he cannot bear the stigma of admission, decided to back out from his stipulation, to make effective treatment impossible, and to insist, nevertheless, on visitation. Since he cannot be acting in good faith or in T's best interest, the court can only conclude that he is trying to salvage his reputation in his home town (Haines) at T's expense.

The trial court's findings leave no doubt that Paul's motion for modification was unreasonable and in bad faith. Therefore, the trial court's award of attorney fees does not constitute an abuse of discretion.

C. JUDGE PEGUES DID NOT ABUSE HIS DISCRETION IN DENYING PAUL'S MOTION FOR DISQUALIFICATION.

In December 1987 Paul moved for recusal of Judge Pegues, who denied Paul's motion. Paul appeals.

8. Paul also contends that in dividing the parties' marital assets the court improperly considered Loretto's post-separation debt. This court has held that the trial court, in dividing marital property, should consider, among other factors, the parties' "financial circumstances." *Merrill v. Merrill*, 368 P.2d 546, 547–48 n. 4 (Alaska 1962). Post-separation debt is one aspect of the parties' "financial circumstances." The trial court did not abuse its discretion in considering this debt.

9. Paul asserts that this second award was for actual attorney fees in excess of $10,000. Nothing in the record supports or contradicts this assertion.

10. In its initial memorandum decision and order, the court recited as an alternative basis for

its award of fees Paul's "frivolous and vexatious" request for custody. In a later memorandum, the court clarified its order:

[T]he court awarded [fees] to Jones in their entirety based on the parties "relative economic situations and earning power." The court went on to hold that full fees and costs would also be appropriate on other grounds. It did not award them on those other grounds.

11. "This court may affirm a trial court's ruling even on different grounds from those advanced by the trial court as a basis for that ruling." *Rutherford v. State*, 605 P.2d 16, 21, n. 12 (Alaska 1979).

In order to prevail on his motion for disqualification, Paul was required to establish that the prior adverse rulings were the result of personal bias developed from a nonjudicial source. *State v. City of Anchorage,* 513 P.2d 1104, 1112 (Alaska 1973). Judge Pegues's determination that Paul had failed to meet this test should be given substantial weight, and his ruling should be reviewed only for an abuse of discretion. *Amidon v. State,* 604 P.2d 575, 577 (Alaska 1979).

In an affidavit submitted with his motion, Paul testified that he had observed Judge Pegues socializing with Barbara Walker, the guardian ad litem in this case. Paul argues that Judge Pegues's rulings reflect bias developed from this social meeting.

In denying Paul's motion, Judge Pegues explained that his social meeting with Ms. Walker had occurred in the presence of his wife and had not involved discussion of this case. He further noted that social meetings with guardians ad litem and counsel were difficult to avoid in a community the size of Haines.

Judge Pegues's explanation is adequate. His denial of Paul's motion was not an abuse of discretion.

### III. CONCLUSION

The judgments of the superior court are AFFIRMED.

RABINOWITZ, J., with whom MATTHEWS, C.J., joins, dissenting, in part.

RABINOWITZ, Justice, with whom MATTHEWS, Chief Justice, joins dissenting in part.

I dissent from the affirmance of the superior court's denial of Paul Nelson's motion to re-establish visitation with his minor daughter T. In my view the superior court abused its discretion in predicating re-establishment of parental visitation upon Paul's admission of sexual abuse. Thus I would reverse the superior court's denial of visitation and direct the entry of an order allowing closely supervised visitation with T conditioned upon, and in conjunction with, continuing psychiatric and psychological treatment of Paul.

The majority notes that "[a] more difficult question is whether, in light of its finding of abuse, the trial court abused its discretion in conditioning further visitation by Paul upon his admission that he abused T." Conceding that the superior court's denial order is "severe," the court nonetheless concludes that its severity is justified by "the overriding need to protect T from further harm." The absence of evidence demonstrating the likelihood of harm to T persuades me that the superior court abused its discretion in denying Paul visitation with his minor daughter.

Admittedly, visitation by an abuser in denial can potentially be harmful to the abused child and abusive conduct can occur even during carefully supervised visitations. On the other hand, Loretto Jones' expert witness had examined neither Paul Nelson nor T, and had not reviewed the psychological records in the case. Further, Paul's expert evidence tended to show that T had not experienced any harmful reactions from supervised visitations with her father.[1]

---

1. I also disagree with the court's affirmance of the superior court's award of attorney's fees against Paul in connection with its denial of Paul's motion for modification. Given my conclusion that the superior court abused its discretion in denying Paul's motion to re-establish visitation (the modification motion) it follows that Paul's motion was not made in bad faith. In the absence of bad faith on Paul's part an award of attorney's fees to Loretto Jones is not authorized. *L.L.M. v. P.M.,* 754 P.2d 262, 264–65 (Alaska 1988).