Michael D. PHILLIPS, Appellant,

v.

STATE of Alaska, Appellee.

No. A–10385.

Court of Appeals of Alaska.

Feb. 17, 2012.

---

Beth Lewis Trimmer and Dan Bair, Assistant Public Advocates, Appeals & Statewide Defense Section; Chad Flanders, additional counsel; and Rachel Levitt and Richard K. Allen, Public Advocates, Anchorage, for the Appellant.

Timothy W. Terrell, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and John J. Burns, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

*OPINION*

MANNHEIMER, Judge.

Michael D. Phillips appeals his convictions for first-degree sexual assault and first- and second-degree physical assault.[1] Phillips raises two main contentions on appeal. Phillips argues that his boots were unlawfully seized following his arrest, and that the superior court should have suppressed all evidence of the forensic testing that was later performed on the boots. In addition, Phillips argues that his trial judge, Superior Court Judge Eric A. Aarseth, should have recused himself when the judge realized, at the beginning of the trial, that the victim's sister lived in his neighborhood and was a friend of his wife.

Phillips's claim that the test results from his boots should have been suppressed hinges on how one construes the facts surrounding Phillips's arrest and the manner in which the police handled his boots. As we explain in this opinion, the pertinent facts are somewhat ambiguous. However, viewing the record in the light most favorable to Judge Aarseth's ruling, we conclude that the record supports the judge's conclusion that the boots were validly seized as part of the search incident to Phillips's arrest.

---

1. AS 11.41.410(a)(1), AS 11.41.200(a)(2), and AS 11.41.210(a)(2), respectively.

The answer to Phillips's next argument—*i.e.*, his claim that Judge Aarseth should have recused himself—is legally more complex.

As soon as Judge Aarseth realized that he had a connection to the victim's sister, he disclosed the details of this connection—in particular, the fact that the sister lived in his neighborhood, that his wife was friends with her, that their children played together, and that the sister's older child had babysat the judge's children. Judge Aarseth concluded that this connection to the victim's sister would not affect his ability to be an impartial decision-maker in Phillips's case. Judge Aarseth further concluded that his connection to the victim's sister was not the type of circumstance that would cause reasonable people to question his ability to be fair and impartial.

Phillips contends that Judge Aarseth committed error in reaching this second conclusion—*i.e.*, the conclusion that there was no appearance of bias—because the judge misunderstood or misapplied the law relating to judicial disqualification. Phillips asks this Court to either reverse Judge Aarseth's decision or at least remand Phillips's case to the superior court for reconsideration of this issue.

■ Prior Alaska decisions on the issue of judicial disqualification repeatedly (and consistently) state that a judge's denial of a recusal motion is reviewed under the "abuse of discretion" standard. But as we explain in this opinion, the "abuse of discretion" standard of review applies only to a judge's decision on the issue of whether the judge is *actually* capable of being fair. On the separate issue of whether, given the circumstances, reasonable people would question the judge's ability to be fair, the proper standard of review is *de novo*—because "reasonable appearance of bias" is assessed under an objective standard. Thus, an appellate court independently assesses whether the circumstances created a reasonable appearance of bias, and the appellate court does not defer to the decision made by the lower court.

Based on our review of the record, we do not believe that Judge Aarseth misunderstood or misapplied the law regarding judicial disqualification. But even if he did, it makes no difference. Because this Court must independently assess the question of reasonable appearance of bias, and because we do not defer to Judge Aarseth's decision, the correctness or incorrectness of his approach to this issue is moot.

Turning then to the ultimate question of whether reasonable people would question Judge Aarseth's ability to be fair, given his connection to the victim's sister, we reach the same conclusion as Judge Aarseth: this connection did not create a reasonable appearance of bias or partiality. Judge Aarseth therefore correctly denied Phillips's recusal motion.

### Whether Phillips's boots were seized during a search incident to his arrest

■ On the night of October 3, 2006, after finishing work, K.M. went to a Cordova bar (the Alaskan) to have a beer. Michael Phillips, whom K.M. had never met before, was also at this bar. They struck up a conversation, and Phillips bought K.M. some drinks. By the time the Alaskan closed, K.M. had consumed numerous drinks. She headed to another bar (the Moose Lodge), and Phillips followed along. They drank at the Moose Lodge until that bar closed, and then K.M. started walking home.

K.M. had only vague recollections of what happened next. She remembered being "pressed down by [her] neck on the ground and feeling ... the cold concrete and ... the sounds of [her]self screaming." She also remembered getting hit in the face, and someone swearing at her and telling her to shut up.

K.M.'s next memory was of waking up in the hospital. As a result of this attack, K.M. required stitches above each eye, on her chin, and in her genital area. K.M. also suffered fractures beneath each of her eyes; repair of these fractures required the insertion of titanium plates.

The assault on K.M. came to the attention of the Cordova police almost immediately, because someone contacted the police depart-

ment to complain about the noise coming from the alley behind the Prince William Sound Hotel. Officer Danny Michels was dispatched to investigate this noise complaint. When Michels arrived at the scene, Phillips was standing with his pants down and his genitals exposed, while K.M. was lying disrobed on the ground, her body exposed from her ankles to above her breasts.

K.M. was barely conscious. Her eyes were nearly swollen shut, and she had blood around both eyes. K.M. also appeared to have a laceration on her left breast, and her mouth was bloody.

When Michels asked Phillips what was going on, Phillips responded that he and K.M. were having sex, and that K.M. passed out.

Michels saw that Phillips's hands were injured: his knuckles and fingernail tips were red and swollen. Phillips also had injuries to his face.

Based on his observations at the scene, Michels called for the assistance of Officer Eva Squires, the Cordova Police Department's sexual assault investigation officer. When Squires interviewed Phillips, Phillips asserted that K.M. was injured because she had repeatedly fallen. But when Squires went to examine the locations where Phillips claimed K.M. fell, she could not find any blood.

Officer Michels took Phillips into custody and transported him to the police station (which also served as the jail)—although Michels did not inform Phillips that he was under arrest for sexual assault until they arrived at the station. Cordova is a small town, and Michels served not only as the arresting officer but the booking officer as well. According to the audio recording of Michels's contact with Phillips, Michels seized Phillips's boots shortly after their arrival at the station, immediately after Michels informed Phillips that he was under arrest, and while Michels was collecting other items of Phillips's outer clothing (his jacket, hat, sweatshirt, and belt).

Michels placed Phillips in a cell. Some time later, Michels had Phillips change from his street clothes into a jail jumpsuit.

The following day, another officer (John Hodges) removed Phillips from his cell and took him to his arraignment. As they were leaving, Phillips saw his boots sitting on the ground in front of a locker. Phillips asked Hodges if he could wear his boots to the arraignment (because he saw that another inmate was wearing personal shoes), but Hodges replied that Phillips could not wear his boots because they were evidence.

Phillips's boots were later tested at the State Crime Laboratory. Bits of tissue and stains that tested presumptively positive for blood were found on the boots. With regard to both the tissue and the blood stains, the DNA retrieved from these samples was consistent with K.M.'s DNA, but it was inconsistent with Phillips's.

In the superior court, Phillips sought suppression of these test results, based on the theory that the seizure of his boots was unlawful. Phillips acknowledged that, given the circumstances, the police had probable cause to believe either that his boots were evidence in and of themselves, or that the boots would contain evidence (such as the tissue and blood samples later retrieved from them). Indeed, on appeal, Phillips concedes that the remainder of his clothing *was* validly seized incident to his arrest. But Phillips notes that the police treated his boots differently from the rest of his clothing: the other articles of clothing were placed in bags in the Cordova evidence locker, while the boots were left near a tote, in the area where shoes were normally placed during inventory searches.

Based on this disparate treatment, Phillips argued that his boots were seized during an inventory search incident to his being booked into jail, not a search incident to his arrest. And under Alaska law, the police may not conduct a general exploratory search of articles seized during an inventory search.[2] Phillips therefore argued that the police had no authority to send his boots to the Crime Lab for forensic testing (absent a valid warrant).

**2.** *Reeves v. State,* 599 P.2d 727, 737–38 (Alaska 1979).

Because Phillips's argument was premised on a particular inference that he wished to draw from the manner in which the police dealt with his boots, a proper evaluation of Phillips's argument hinged, to a certain extent, on the practices and policies of the Cordova police.

As we have already noted, the Cordova police station and jail comprise a single physical facility. Moreover, Officer Michels was not only the arresting officer but the booking officer as well. Thus, there was not the kind of demarcation between the arresting process and the booking process that one might expect in larger urban centers.

Officer Hodges—who was officially the evidence custodian of the Cordova Police Department—testified about the laxness (or at least uneven application) of jail policies, as well as the latitude of the police practices governing collection and storage of evidence. For instance, according to Cordova jail policy, inmates were not supposed to wear their own clothes while in jail; instead, they were to be given a jail jumpsuit to wear. However, Hodges testified that this policy was rarely followed.

Hodges further testified that a jail inmate's personal belongings—which included anything that was seized from the inmate's person, plus their street clothing, if they were to be dressed in a jumpsuit—would be placed in a tote and then locked in a cabinet. On the other hand, items seized from an arrestee for purposes of investigation (whether by consent or under color of authority) might be stored in the evidence room or, if the evidence room was not available, stored in a locked jail cell. It appears that Phillips's boots were not treated in either of these fashions. Instead, as we have explained, the boots were sitting out in plain sight when Phillips was taken to his arraignment, several hours after his arrest.

Judge Aarseth denied Phillips's suppression motion because he concluded that Phillips's boots were indeed seized during a search incident to arrest. The judge noted that the police had ample probable cause to believe that Phillips had committed a sexual assault, and ample reason to believe that Phillips's outer clothing might contain trace evidence of that assault (such items as hair, fiber, blood, and other bodily fluids).

As we have explained, the record shows that the police seized Phillips's boots at the same time they seized several other articles of his outer clothing. As we have also explained, Phillips concedes that the other articles of clothing were lawfully seized incident to his arrest—because those items were placed in bags and put into the evidence locker. The real issue, then, is whether a reasonable judge could conclude, on these facts, that Phillips's boots were also seized incident to his arrest, even though the boots were handled differently.

We conclude that Judge Aarseth could reasonably find that, despite the different handling of Phillips's boots, the boots were seized during the same search incident to arrest as the other articles of Phillips's clothing. Accordingly, we uphold Judge Aarseth's denial of Phillips's suppression motion.

*Whether Judge Aarseth should have recused himself because of his connection to K.M.'s sister*

■ Phillips's trial was held in Anchorage in April 2008. Following the completion of jury selection, the parties assembled in court on April 14th for the administration of the oath to the jurors and the presentation of opening statements.

When court convened, Judge Aarseth spotted a woman in the courtroom whom he recognized—a woman who lived in his neighborhood. During a break in the proceedings, Judge Aarseth informed the parties that he knew this woman, that she lived in his neighborhood, and that her first name was "Sara"—although the judge could not recall her last name. It turned out that this woman was K.M.'s sister.

The prosecutor explained that Sara was not going to be a witness in Phillips's case; rather, she was there to offer support to her sister, K.M. Nevertheless, Judge Aarseth perceived that his acquaintance with Sara might make Phillips or his attorney uneasy, so the judge provided the parties with further details of his relationship with her.

The details of Judge Aarseth's connection to Sara (as explained by the judge on the record) are not in dispute. Sara and her husband were relatively new to the judge's neighborhood; they had lived there for less than a year. Sara and her husband had children who were a little older than the judge's children, and the children played together. Sara's oldest child had babysat the judge's children on a couple of occasions.

Judge Aarseth's wife socialized with Sara, and there were times when she and Sara would speak to each other several times a day. On the other hand, the judge's own relationship with Sara was substantially more attenuated: he had attended one social event at Sara's house, but "other than that, [he had] had minimal contact with this lady". The judge characterized his relationship with Sara as an "acquaintanceship" rather than a "close friendship".

Having explained his relationship with Sara, Judge Aarseth concluded that his acquaintance with Sara would not affect his ability to be fair in Phillips's case. The judge therefore announced that he did not intend to recuse himself, but he invited Phillips's attorney to make a recusal motion if the defense attorney believed that the issue should be pursued further.

### (a) The litigation of this issue in the superior court

Phillips's attorney did, in fact, formally ask Judge Aarseth to recuse himself. The defense attorney argued that, no matter how attenuated Judge Aarseth's relationship with Sara might be, the judge would be influenced by the fact that a neighbor of his was the victim's sister. The defense attorney argued in the alternative that, even if Judge Aarseth was capable of remaining impartial, the judge's acquaintance with Sara created the appearance of partiality.

After listening to the defense attorney's argument (and hearing the prosecutor's response), Judge Aarseth dismissed the jury for the day and then called a recess so that he consider his ruling. When court reconvened (without the jury), Judge Aarseth reiterated his conclusion that his acquaintance with K.M.'s sister Sara would not affect his subjective ability to make impartial decisions in Phillips's case.

Judge Aarseth then addressed the defense attorney's alternative argument: the argument that the judge's connection to Sara created a reasonable appearance of bias. Readers should pay particular attention to the italicized third paragraph of the judge's remarks—where Judge Aarseth discussed a judge's duty to sit on the cases assigned to them—because this is the part of Judge Aarseth's analysis that Phillips attacks in this appeal:

> *The Court:* The [defense recusal] motion ... also incorporates the issue of appearance [of partiality].... I call[ed] Ms. Greenstein, [the executive director of] the Alaska Judicial Conduct Commission, to get some advice [on this point]. And, frankly, ... I discussed with her [how] judges ... in small communities ... [handle this] situation.
>
> It is very common in Alaska [to have only] one local judge, and ... [that judge] basically [faces this situation] in probably every case that comes in front of them. They need to make [the] determination of whether they need to recuse themselves [because of their acquaintance with people], and [whether there is] the appearance [of partiality]....
>
> *[I]n Alaska, there is a duty to recuse yourself ... if reasonable people would feel that ... you are not going to be, or would not be, fair and impartial. But there first is a duty to sit on the cases that you are assigned to[; it] is the presumption [of] the law that you are going to [sit] on the cases that you are assigned to, and that you only recuse yourself when there is good cause.*
>
> I do not find that ... good cause exists for me to recuse myself from this case based upon any potential appearance of partiality or bias, because I don't think that anyone could come to that conclusion, reasonably.... So, therefore, I am denying the motion [for recusal].

Later, Judge Aarseth issued a written order re-affirming his oral decision. With respect to Phillips's argument that the judge's

connection to Sara created a reasonable appearance of bias, Judge Aarseth wrote:

> I ... find that the tangential connection between my neighbor [*i.e.*, K.M.'s sister Sara] and this case does not reasonably create the appearance of bias or partiality on my part. Judges in small communities in Alaska face this decision every day. If the judge has been in the community for any length of time, they frequently will know many of the people involved in the case and yet [they] remain ... a fair and impartial judge to preside over the trial. I also take into account that judges have a duty to remain on the cases ... assigned to [them] and [to] only recuse themselves for good cause. "It should be kept in mind that a judge has as great an obligation not to disqualify himself, when there is no occasion to do so, as he has to [disqualify himself] in the presence of valid reasons." *Amidon v. State,* 604 P.2d 575, 577 (Alaska 1979). I do not find that good cause exists [for my disqualification].

(For ease of reading, we have incorporated the wording of Judge Aarseth's footnote—a footnote citing and quoting *Amidon*—into his main text.)

Because Judge Aarseth denied Phillips's recusal motion, he was required by AS 22.20.020(c) to refer the matter to the presiding judge of the next higher level of court, so that the presiding judge could appoint another judicial officer to immediately review Judge Aarseth's decision. Phillips's case was a criminal case, so the next higher level of court was this Court, and Judge Aarseth should have asked Chief Judge Coats to assign a judicial officer to review his decision.[3] Instead, Judge Aarseth referred the matter to Chief Justice Dana A. Fabe of the Alaska Supreme Court, and Justice Fabe appointed Superior Court Judge Jack W. Smith to review Judge Aarseth's decision.

(In *Amidon,* the supreme court addressed this type of error—*i.e.,* one judge reviewing another judge's denial of a recusal motion, in the absence of a proper order of appointment from the presiding judge of the next higher level of court. The supreme court concluded that the error would be deemed harmless unless a party made a timely objection to the procedural irregularity. 604 P.2d at 577. Neither Phillips nor the State objected to Judge Aarseth's decision to ask Chief Justice Fabe to appoint the reviewing judge.)

After Judge Smith reviewed the case, he agreed with Judge Aarseth that the judge's connection to K.M.'s sister Sara did not create a reasonable appearance of bias. Accordingly, Judge Smith affirmed Judge Aarseth's decision not to recuse himself.

In this appeal, Phillips does not question Judge Aarseth's conclusion that he could *in fact* remain impartial despite his connection to K.M.'s sister. However, Phillips argues that the circumstances of this case created a reasonable *appearance* that Judge Aarseth would be biased because of his connection to K.M.'s sister, and therefore Judge Aarseth should have recused himself on this basis.

*(b) The conflicting Alaska case law on the question of whether a judge can be removed from a case based solely on the appearance of bias*

In researching the law pertinent to Phillips's case, this Court has carefully re-read the major Alaska appellate decisions dealing with judicial disqualification. Our research reveals that both this Court and the Alaska Supreme Court have issued conflicting decisions on the question of whether a judge can be removed from a case, against the judge's will, based solely on the *appearance* of bias (as opposed to proof of the judge's actual bias).

The seminal case on this issue is our supreme court's decision in *Amidon v. State,* 604 P.2d 575 (Alaska 1979). The defendants in *Amidon* sought to disqualify the sentencing judge under the statutory provision that is now numbered AS 22.20.020(a)(9). This subsection of the statute provides that a judicial officer is disqualified in any court action in which "the judicial officer feels that, for any reason, a fair and impartial decision cannot be given".

(This use of the passive voice was written into the statute in 1987, in an apparent at-

---

**3.** *See Burrell v. Burrell,* 696 P.2d 157, 165 (Alaska 1984).

tempt to make the statute gender-neutral.[4] It is clear, however, from the prior version of the statute (the version quoted in *Amidon*) that the intent of this provision is to require judges to disqualify themselves whenever they believe that *they* could not render a fair and impartial decision.)

In *Amidon*, the supreme court recognized that a judge who is challenged under this provision of the statute must, in essence, conduct an assessment of their own attitudes and emotions, and reach a conclusion as to whether they personally feel that they could be fair. If the judge concludes that they could be fair, "[this] decision should be given substantial weight", and an appellate court should reverse the judge's decision "only if it amounted to an abuse of discretion". *Amidon*, 604 P.2d at 577.

The "abuse of discretion" standard of review is appropriate in this context because, when a judge decides whether they are subjectively capable of being fair, the judge must not only assess the facts of the case but must also engage in self-examination to gauge the effect that these facts might have on the judge's decision-making process.

■ Under the "abuse of discretion" standard of review, a judge's conclusion that they could remain fair and impartial is accorded great deference; an appellate court should reverse the judge's decision only if that decision "is clearly untenable or unreasonable".[5] Or, as the supreme court expressed this concept in *Amidon*, "we will not overturn [the] judge's decision unless it is plain that a fairminded person could not rationally come to that conclusion on the basis of the known facts." *Id.* at 577.

In *Amidon*, the supreme court discussed the circumstances under which a judge's decision might be shown to be clearly unreasonable:

> Cases can be imagined in which the refusal of the judge to disqualify himself would be patently unreasonable in light of the objective facts. A showing of actual bias in the decision rendered ... or the appearance of partiality might be sufficient grounds for

us to reverse in an appropriate case. Where only the appearance of partiality is involved, however, we will require a greater showing for reversal.

*Id.*, 604 P.2d at 577.

The supreme court speaks here of "the appearance of partiality", but it is important to remember that the ultimate question in *Amidon*—the ultimate question posed by the governing statute—was whether Amidon's sentencing judge could reasonably conclude that he could *actually* be fair.

In the above-quoted passage, when the supreme court speaks of "actual bias in the decision [later] rendered" or "the appearance of partiality", the supreme court is saying that proof of these things might be convincing circumstantial evidence that the challenged judge made an unreasonable assessment of their own ability to be fair when the judge denied the recusal motion. But the court is not saying that the appearance of partiality could independently justify the removal of a judge from a case.

Regarding the issue of *appearance* of partiality, the supreme court noted that, under the Code of Judicial Conduct, judges are ethically required to disqualify themselves in any case where their impartiality "might reasonably be questioned". *Id.* at 578, quoting former Judicial Canon 3(C)(1). (The current corresponding canon is Canon 3(E)(1).) But the supreme court also noted that the statute governing judicial disqualification, AS 22.20.020, contained no provision that allowed judges to recuse themselves based on the appearance of partiality alone. *Amidon*, 604 P.2d at 578. The supreme court then openly asked the Alaska Legislature to amend the statute to allow judicial disqualification based on the reasonable appearance of partiality. *Ibid.* (This request has gone unheeded for 32 years.)

The concluding paragraph of the *Amidon* opinion further demonstrates that the supreme court did not view "reasonable appearance of partiality" as an independent ground for disqualifying a judge—because, in

---

**4.** *See* SLA 1987, ch. 38, § 10.

**5.** *Gonzales v. State*, 691 P.2d 285, 286 (Alaska App.1984).

that concluding paragraph, the supreme court did not mention that issue at all. Rather, the supreme court simply decided that the sentencing judge had not abused his discretion when he denied the recusal motion—because "[a] complete review of the record and the sentence imposed gives no indication of *any actual bias or prejudice* on the part of [the sentencing judge]." *Ibid.* (emphasis added).

From 1979 (the year that *Amidon* was decided) until 1991, when this Court decided *Perotti v. State*, 806 P.2d 325 (Alaska App. 1991), no reported Alaska appellate decision held (or even hinted) that a judge might be disqualified, over the judge's objection, based solely on the appearance of bias. As *Amidon* explains, a strong appearance of bias might be convincing proof that the challenged judge acted unreasonably when the judge concluded that they were free of *actual* bias. But an appearance of bias, standing alone, is not a ground for judicial disqualification under the governing statute, AS 22.20.020. *See Amidon*, 604 P.2d at 577.

Indeed, in *Feichtinger v. State*, 779 P.2d 344 (Alaska App.1989), this Court expressly held that Alaska law did *not* allow a judge to be removed from a case, over the judge's objection, based merely on the appearance of partiality. Here is the pertinent portion of *Feichtinger*, with the accompanying footnote integrated into the text for ease of reading:

> The sole legislative authority for disqualification of a trial judge, over the judge's objection, is found in AS 22.20.020. *Amidon v. State*, 604 P.2d 575, 577–78 (Alaska 1979). Feichtinger's [argument on appeal is flawed in] failing to distinguish between a trial judge's right to recuse himself or herself, which may be based on [a reasonable appearance of partiality under] Canon 3 of the Code of Judicial Conduct, and a ... judge's power to disqualify another judge pursuant to AS 22.20.020(c). *See Blake v. Gilbert*, 702 P.2d 631, 641–42 (Alaska 1985), *overruled on other grounds;* 770 P.2d 290 (Alaska 1989). As the supreme court has held repeatedly, one judge may only disqualify another judge as provided in AS 22.20.020.

*Feichtinger*, 779 P.2d at 347 & n. 4.

In other words, under *Feichtinger*, judges who are challenged for bias have the *option* of recusing themselves from a case if they are convinced that the facts give rise to a reasonable appearance of partiality—because, in that circumstance, the judge has an ethical duty (under the Alaska Code of Judicial Conduct) not to participate in the case.

But even though the Alaska Commission on Judicial Conduct might discipline a judge who knowingly violates this ethical duty, *Feichtinger* holds that this ethical duty can not be enforced by another judge who is reviewing the challenged judge's denial of a recusal motion under AS 22.20.020. Judicial review of the challenged judge's decision is limited to the grounds for disqualification specified in AS 22.20.020(a), and (as the supreme court noted in *Amidon* ) this statute does not authorize disqualification of a judge based merely on the reasonable appearance of bias.

This Court's decision in *Feichtinger* seemingly resolved the question of whether a judge could be disqualified from a case, over their objection, based solely on the appearance of bias. The answer, according to *Feichtinger*, is "no". However, less than a year and a half later, in *Perotti v. State,* this Court held that a judge *could* be removed from a case, over their objection, based purely on the appearance of bias.

The crucial portion of the *Perotti* decision turned on a quotation from *Amidon,* which the *Perotti* court lifted out of context.

In *Amidon*, 604 P.2d at 577, the supreme court declared that "the appearance of partiality might be sufficient grounds for us to reverse [a judge's refusal to recuse themself] in an appropriate case." In *Perotti*, 806 P.2d at 327–28, this Court interpreted the supreme court as saying that, even when there is no showing of a judge's actual bias, the appearance of partiality might be sufficient, standing alone, to require the judge's disqualification.

As we have already explained, this was not the supreme court's holding, nor was it the

supreme court's intention. Rather, the supreme court was saying that a strong appearance of bias might be convincing circumstantial evidence that the challenged judge made an unreasonable assessment of their own *subjective* ability to be fair when they denied the recusal motion. *Amidon* did not hold that a strong appearance of bias, standing alone, was a ground for judicial disqualification. Instead, *Amidon* explicitly held that the judicial disqualification statute, AS 22.20.020, only allowed disqualification for *actual* bias.

Not only did the *Perotti* decision misinterpret *Amidon*, but it also completely ignored this Court's previous decision in *Feichtinger*, which had been issued less than a year and a half before. As we have explained, *Feichtinger* held that a judge could *not* be removed from a case, over the judge's objection, based solely on the appearance of bias. The *Perotti* decision contains no discussion of that previous holding.

(The *Perotti* decision does mention *Feichtinger* once, in passing: there is a single, unexplained "see also" citation to *Feichtinger*, right after the misinterpreted quote from *Amidon* concerning the appearance of bias. *Perotti*, 806 P.2d at 328.)

In sum, this Court issued contrary decisions on the same point of law within a period of eighteen months.

(Of the three judges who decided *Feichtinger*, only one—Judge James Singleton— was a regular member of this Court. The other two judges who participated in *Feichtinger* (Judges Jay Hodges and Niesje Steinkruger) were sitting *pro tempore*. By the time *Perotti* was decided, Judge Singleton had left the Court. *Perotti* was decided by the remaining two regular members of the Court (Judges Bryner and Coats) plus another *pro tempore* judge (Judge Elaine Andrews). In other words, there was absolutely no overlap between the judges who

participated in *Feichtinger* and the judges who participated in *Perotti*.)

In 1996, five years after this Court decided *Perotti*, the Alaska Supreme Court addressed this point of law in *Wasserman v. Bartholomew*, 923 P.2d 806 (Alaska 1996). In *Wasserman*, the supreme court cited *Perotti* with approval for the proposition that an appearance of bias is sufficient to warrant judicial disqualification. *Id.* at 815.

The supreme court acknowledged this Court's decision in *Feichtinger*, where we distinguished the ethical duty imposed by Judicial Canon 3 from the legal duty of disqualification imposed by AS 22.20.020, and where we held that one judge could disqualify another judge only for the reasons specified in the disqualification statute, and not solely based on the appearance of bias. *Wasserman*, 923 P.2d at 815. But then the supreme court added:

> However, we have relied upon [Judicial Canon 3] to interpret the [disqualification] statute, ... finding that[,] because of the canon, AS 22.20.020(a)(9) includes an "appearance of impartiality." *Perotti v. State*, 806 P.2d 325, 327 (Alaska App.1991); *Amidon v. State*, 604 P.2d 575, 577–78 (Alaska 1979).

*Ibid.*

The above-quoted statement is somewhat puzzling, because the supreme court asserts that *it* had interpreted AS 22.20.020 to include disqualification based solely on the appearance of bias. But of the two cases cited for this proposition, the first one is *this Court's* decision in *Perotti* (which does, in fact, stand for this proposition), and the second one is the supreme court's own decision in *Amidon*—which, as we have explained, stands for the opposite proposition.[6]

Despite this tension in the law, we will assume, for purposes of deciding Phillips's case, that Alaska law mandates disqualification of a judge when the circumstances give rise to a reasonable appearance of bias, even

---

6. In the interest of complete disclosure, and in fairness to the supreme court, we note that the author of the present opinion has likewise cited *Amidon* for the proposition that "a judge's duty of recusal encompasses not only those cases in which the judge actually can not be fair and unbiased, but also those cases in which the judge's participation would lead reasonable people to question the fairness of the proceedings." *See Keller v. State*, 84 P.3d 1010, 1011–12 (Alaska App.2004).

when there is no proof that the judge is actually biased. We make this assumption for two reasons.

First, even though *Feichtinger* and *Perotti* reach contrary conclusions, and even though *Perotti* contains no mention (much less any analysis) of the contrary holding in *Feichtinger*, *Perotti* is the later decision.

Second, despite the questions raised by the supreme court's discussion of this point in *Wasserman*, the supreme court does appear to have endorsed the idea that a judge can be disqualified, over the judge's objection, based solely on the reasonable appearance of bias.

For these reasons, we proceed to the question of whether the circumstances here gave rise to a reasonable appearance that Judge Aarseth would be biased in his handling of Phillips's case.

### (c) The applicable standard of review

The supreme court declared in *Amidon*, 604 P.2d at 577, that a judge's denial of a recusal motion would be reviewed under the "abuse of discretion" standard. But as we explained in the preceding section of this opinion, the supreme court was speaking about appellate review of a judge's ruling—really, a judge's self-examination—on the issue of whether the judge believed they would *actually* be biased in their handling of the case. The *Amidon* decision did not deal with appellate review of a judge's ruling as to whether the circumstances of the case created a *reasonable appearance* of bias.

In *Perotti*, 806 P.2d at 327, this Court likewise declared (citing *Amidon*) that a judge's denial of a recusal motion should be reviewed for abuse of discretion. And when, in *Perotti*, this Court reviewed the superior court judge's ruling that he could *actually* be fair and impartial, that is the test that this Court employed. According to this Court, that issue was not even close:

> In Perotti's case, Judge Hodges' belief that he could actually be impartial deserves great deference, and the record contains little countervailing evidence of

actual bias to overcome [the judge's] finding.

*Perotti*, 806 P.2d at 328.

But on the separate issue of whether the circumstances created a reasonable appearance of bias, this Court faced a problem in *Perotti*: it was impossible to review the superior court's ruling for "abuse of discretion" because the superior court made no ruling on this issue.

As explained in the *Perotti* decision, neither Judge Hodges nor Judge Zervos—the judge who reviewed Judge Hodges's decision under AS 22.20.020(c)—issued any ruling on the question of whether the circumstances gave rise to a reasonable appearance of bias. Instead, both judges focused solely on the issue of whether Judge Hodges could actually be fair. 806 P.2d at 327, 328. Indeed, Judge Zervos "expressly declined to consider [the] appearance of partiality as a factor in reviewing Judge Hodges' decision." *Id.* at 328.

(Given this Court's holding in *Feichtinger*—the holding that Alaska law did not allow one judge to disqualify another judge based solely on the appearance of bias—it is hardly surprising that, once Judge Zervos concluded that Judge Hodges could *actually* be fair and unbiased, Judge Zervos would then decline to consider the separate issue of whether the circumstances gave rise to an appearance of bias. Under *Feichtinger*, this latter issue was utterly moot.)

If the "abuse of discretion" standard of review truly governed the issue of appearance of bias, then—because there was no pertinent ruling by the lower court—one would expect this Court to remand Perotti's case to the superior court, so that either Judge Hodges or Judge Zervos, or both of them, could exercise their discretion by considering and ruling on the question of the appearance of bias.

But this Court pursued a different course: "In the absence of express findings," the *Perotti* court declared, "we must base our consideration of this issue on the totality of the circumstances in the record." *Id.* at 328. In other words, this Court proceeded to decide the issue independently, without any

deference to how Judge Hodges or Judge Zervos might have viewed the issue if they had addressed it.

This Court's action was inconsistent with the notion of "abuse of discretion" review. But this Court's action was eminently reasonable if (1) "reasonable appearance of bias" is assessed under an objective standard (which it is), and (2) there were no material facts in dispute (which was the case in *Perotti* ).

■ Sometimes one must look beyond what a court *says* it is doing and, instead, focus on what the court actually *is* doing. Examining the *Perotti* decision in this manner, we construe *Perotti* to stand for the proposition that, under a given set of facts, it is a question of law whether those facts create a reasonable appearance that a judge will be biased. And because this is an issue of law, an appellate court decides the issue *de novo*—that is, without deference to any ruling issued by the lower court.

If we were to apply the "abuse of discretion" standard of review to judges' rulings about the reasonable appearance of bias, we would implicitly be declaring that appellate courts would be—and should be—willing to uphold two contradictory rulings by different judges under exactly the same facts, so long as each of the challenged judges gave some reasonable explanation of why they did, or did not, believe that a reasonable person would question their ability to be fair. This would be fundamentally inconsistent with the idea that "reasonable appearance of bias" is an objective test, and not a subjective assessment.

(See *Erickson v. State*, 950 P.2d 580, 586 (Alaska App.1997), where we discussed the related problem of double jeopardy rulings at sentencing—*i.e.*, rulings as to whether a defendant's separate counts should be merged, and only one conviction and sentence imposed. We concluded that these double jeopardy rulings should be reviewed *de novo*, and not under the "clearly mistaken" standard of review that normally governs sentencing decisions, because application of the "clearly mistaken" standard of review would lead to the affirmance of contradictory decisions based on exactly the same facts.)

Accordingly, under the assumption that *Perotti* correctly states the governing law— *i.e.*, under the assumption that a judge can be disqualified, over their objection, based solely on the appearance of bias—we hold that it is a question of law whether, under given facts, the circumstances create a reasonable appearance of bias. And, accordingly, we hold that this issue is reviewed *de novo*.

### (d) Phillips's claim that Judge Aarseth misunderstood or misapplied the doctrine of a judge's duty to sit

In *Amidon,* the supreme court urged its readers to "[keep] in mind that a judge has as great an obligation not to disqualify himself, when there is no occasion to do so, as he has to [disqualify himself] in the presence of valid reasons." 604 P.2d at 577. This Court discussed this doctrine—the so-called "duty to sit"—at greater length in *Feichtinger:*

> Judges will frequently be assigned cases involving unpleasant issues and difficult problems. Often litigants and their attorneys will be particularly vexatious. In many cases, publicity adverse to the judge is virtually certain no matter what decision he or she reaches. In such cases, judges insufficiently attuned to their responsibilities might readily welcome a baseless request for recusal as an escape from a difficult case. To surrender to such a temptation would justly expose the judiciary to public contempt based on legitimate public concern about judicial integrity and courage. While we agree that judges must avoid the appearance of bias, it is equally important to avoid the appearance of shirking responsibility.

*Feichtinger,* 779 P.2d at 348.

In this appeal, Phillips contends that there are two ways in which a judge might interpret this "duty to sit" precept.

A judge might interpret the "duty to sit"— the duty to carry out one's assigned duties in the absence of a valid reason for disqualification—as simply the converse of the judge's duty of recusal when there *is* a valid reason for disqualification. This is how the doctrine

is described in both *Amidon* and *Feichtinger*. Judges have a duty to carry out the tasks assigned to them—in particular, the duty to preside over and decide the cases assigned to them—unless there is good cause for the judge's recusal. But if there *is* good cause for recusal, then a judge has a duty to acknowledge the disqualification and remove themself from the case.

Phillips suggests that some judges might interpret the "duty to sit" as a countervailing consideration that must be weighed against any valid ground for disqualification. In other words, Phillips suggests that a judge might employ the "duty to sit" doctrine as a justification for denying a recusal motion, even when the judge was convinced that there *was* a valid ground for their recusal, if the judge was also convinced that, under the circumstances, the judge's "duty to sit" was entitled to greater weight.

Based on our review of Judge Aarseth's oral ruling and his later written ruling, we see no reason to think that he applied the "duty to sit" doctrine in the way that Phillips suggests. Instead, Judge Aarseth seems to have applied the doctrine as it is explained in *Amidon* and *Feichtinger*.

But this point is moot. Phillips does not challenge Judge Aarseth's ruling that he could *actually* be fair—a ruling that we would review for abuse of discretion, pursuant to *Amidon*. Rather, Phillips challenges Judge Aarseth's conclusion that the circumstances of this case did not give rise to a reasonable appearance of bias. And as we explained in the preceding section of this opinion, because the material facts are not in dispute, the question of the appearance of bias is an issue of law that we, as an appellate court, decide independently. We do not defer to Judge Aarseth's (or Judge Smith's) ruling on this issue. This fact moots any potential flaw in those judges' understanding or application of the duty to sit.

*(e) Whether Judge Aarseth's connection to K.M.'s sister gave rise to a reasonable appearance of bias*

We now turn to the remaining issue in this appeal: whether Judge Aarseth's connection to K.M.'s sister gave rise to a reasonable appearance of bias.

Phillips argues that the relationship between Judge Aarseth and K.M.'s sister Sara "attained a degree of intimacy" that would cause reasonable people to question the judge's ability to be fair in Phillips's case. To support this assertion, Phillips relies on the fact that Sara lived in Judge Aarseth's neighborhood, that Judge Aarseth's wife was friends with Sara and spoke with her frequently, that the judge's children played with Sara's children, and that the judge and his wife had, on occasion, entrusted their children to the care of Sara's older daughter. Phillips contends that this "multi-layered relationship" exceeded the bounds of casual acquaintance and rose to a level of friendship that would make reasonable people doubt Judge Aarseth's ability to be fair.

There are many levels or degrees of friendship in our society. Thus, when a question arises as to whether a judge's acquaintance or friendship with a particular person requires the judge's disqualification, the answer must ultimately turn on the specific facts of the case—in particular, the precise nature of the judge's relationship with that person, and the way in which that person is connected to the litigation.

The judge who is asked to recuse themself—and later, the reviewing court—must gauge whether someone who was apprised of the situation would reasonably suspect that the judge's ability or willingness to decide the case fairly would be compromised by the judge's feelings about, or toward, the other person.

But even though each case must turn on its facts, the literature on this subject provides guidelines for assessing this issue. In Richard E. Flamm's treatise, *Judicial Disqualification: Recusal and Disqualification of Judges* (2nd ed.2007), he notes that judges "[are not] expected to withdraw from society", *id.* at 194, and he then states:

> [I]t is generally agreed that the mere fact that a judge maintains an ordinary social relationship ... either with [one or more] parties to the proceeding or with the attorneys ... does not provide a valid basis for

disqualifying that judge from presiding over proceedings involving [these] persons.

*Id.* at 195 (collecting cases).

This same guideline applies to situations where the judge is socially acquainted with the alleged victim in a criminal case. According to the treatise, "the fact that the judge may [be] acquainted with [the alleged] victim of the crime [the] defendant [is] accused of committing is generally deemed to be insufficient to mandate [the judge's] disqualification". *Id.* at 206.

Mr. Flamm then addresses the situation presented in Phillips's case:

[Because a judge's acquaintance with the victim does not ordinarily require the judge's disqualification, it necessarily follows that a judge's] mere acquaintance with a crime victim's *relative* is not ordinarily deemed to be disqualifying.

*Id.* at 207 (emphasis added).

Although Phillips asserts that Judge Aarseth's relationship with K.M.'s sister Sara exceeded mere social acquaintance or social friendship, the record does not support this assertion. According to the record, Judge Aarseth had very limited contact with Sara. The primary relationship here was between Sara and Judge Aarseth's wife. Moreover, that relationship appears to have been the kind of social friendship that one might expect between two women who live in the same neighborhood and who are the primary caretakers of children of similar ages.

Several Alaska cases have upheld judges' refusals to disqualify themselves when the judges had social connections to participants in the litigation.

For instance, in *Nelson v. Jones,* 781 P.2d 964 (Alaska 1989), the supreme court upheld a judge's denial of a recusal motion that was premised on the fact that the judge had been observed socializing with the guardian *ad litem* (who was of the opposite sex). *Id.* at 971–72. *Nelson* was a pre-*Perotti* case, and thus the supreme court considered only the question of the judge's actual bias, and not the reasonable appearance of bias. Nevertheless, the supreme court noted that there were two reasons why the judge's socializing with the guardian *ad litem* did not suggest

any bias: first, the judge's wife was present at this same social gathering; and second, it would be difficult for a judge in a small community to completely avoid socializing with the attorneys and the guardians in the cases assigned to them. *Id.* at 972.

(See also *Keller v. State,* 84 P.3d 1010, 1012 (Alaska App.2004), where this Court noted that "[a]ny judge, but especially judges in smaller communities, will from time to time be assigned to a case which involves people whom the judge knows.")

In *Barrett v. Barrett,* Alaska Memorandum Opinion No. 1053 (November 14, 2001), 2001 WL 34818273, the question was whether a trial judge should be disqualified because of the judge's acquaintance with a potential witness—a woman who worked at the eye care office where the judge was a patient. 2001 WL 34818273 at *1. The supreme court noted that the judge's contact with this potential witness was limited, and that their relationship was a professional one. *Id.,* 2001 WL 34818273 at *2. Moreover, this woman was not actually called to testify; thus, nothing in the ultimate decision of the case hinged on any matter within this witness's knowledge. *Ibid.*

Similarly, in *Nighswonger v. State,* Alaska App. Memorandum Opinion No. 2569 (December 9, 1992), 1992 WL 12153670, this Court concluded that no recusal was necessary in a case where the judge was a social acquaintance of the prosecutor, but not close friends with her. 1992 WL 12153670 at *9–10.

There are no Alaska cases where judicial disqualification has been required based on the kind of tangential relationship presented in Phillips's case—a judge's social acquaintance with a relative of the alleged victim. We further note that there was no evidence (nor any allegation) that Judge Aarseth had discussed the case with Sara or that she had otherwise expressed her views about the case to him.

Given this record, we conclude that the facts of Judge Aarseth's connection to K.M.'s sister Sara would not cause reasonable people to doubt the judge's ability and willingness to be fair. Accordingly, there was no

good reason for Judge Aarseth to remove himself from the case, and Phillips's recusal motion was properly denied.

*Conclusion*

The judgement of the superior court is AFFIRMED.